829 F.2d 437
 44 Fair Empl.Prac.Cas. 1736,
44 Empl. Prac. Dec. P 37,460, 41 Ed. Law Rep. 1261
 HANKINS, Althea V., Dr., Appellant,
v.
TEMPLE UNIVERSITY (HEALTH SCIENCES CENTER) and Tourtellotte,
Charles D., Dr., Chief, Rheumatology Section Temple
University School of Medicine and Berney, Steven N., Dr.,
Temple University Section of Rheumatology and Conaway,
Douglas C., Dr., Temple University Department of Medicine
Section of Rheumatology, Appellees.
 Nos. 86-1476, 87-1246.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6)
July 13, 1987.
Decided Sept. 23, 1987.
 
 Larry Charles Miller, Philadelphia, Pa., for appellant.
 Stephen Bosch, Temple University, Office of University Counsel, Philadelphia, Pa., for appellees.
 Before GIBBONS, Chief Judge, MANSMANN, Circuit Judge and McCUNE, District Judge*.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 Dr. Althea Hankins brought suit against Temple University and several members of its faculty, claiming that she was terminated from a fellowship program in the Rheumatology Department of the University's hospital because of her race and sex, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d et seq. (1982), Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982), and 42 U.S.C. Sec. 1981 (1982). She also alleged that her dismissal from the program was accomplished in violation of due process. The district court denied Hankins' motion for a preliminary injunction, and subsequently granted the University's motion for summary judgment. Hankins' appeals from these orders were consolidated by this court. We will affirm.[1]
 
 I.
 
 2
 Dr. Hankins, a black female physician, was accepted into a fellowship program in the Rheumatology Section of Temple University Hospital for the period beginning July 1, 1984. As a fellow, she was also admitted into an instructional program in the School of Medicine, where she was to receive clinical training from the medical faculty. Her immediate supervisors were Charles D. Tourtellotte, M.D., Professor of Medicine and Chief of Rheumatology, Steven N. Berney, M.D., Associate Professor of Medicine, and Douglas C. Conaway, M.D., Assistant Professor of Medicine. Pursuant to her fellowship, Dr. Hankins was granted privileges at the hospital, and became a member of the medical staff. See Letter from Gerald Miller to Althea Hankins, M.D. (September 26, 1984), reprinted in Appendix at 65a.
 
 
 3
 In addition, Dr. Hankins was appointed Clinical Instructor in the Department of Medicine, the appointment to run concurrently with her appointment as a fellow. See Letter from Leo M. Henikoff, M.D. to Althea Hankins, M.D., (June 28, 1984), reprinted in Appendix at 498a. Her employment as an instructor did not obligate the University to provide her with financial remuneration or tenure. Rather, her salary, fringe benefits, and malpractice insurance were provided through her participation as a fellow. Id.
 
 
 4
 During the course of Dr. Hankins' fellowship, it became the opinion of her supervisors that her performance was inadequate. On May 10, 1985, Dr. Tourtellotte sent a memorandum to Dr. Hankins, outlining the Rheumatology Department's dissatisfaction with her development. See Memorandum from Charles D. Tourtellotte, M.D. to Althea Hankins, M.D. (May 10, 1985), reprinted in Appendix at 476a. Dr. Tourtellotte noted, in this correspondence, that members of the faculty had already met with Dr. Hankins several times to discuss deficiencies in her overall performance. Moreover, he informed appellant:
 
 
 5
 Your continued service with us will require significant improvement in all of the following areas which have been found deficient by us: 1-attendance and punctuality-daily activities and conferences; 2-peer relationships-effectiveness as a consultant for students, residents, referring physicians; 3-histories, physical examinations, special techniques, management plans expected of a medical subspecialist consultant; 4-consultations and progress notes of the character and level expected; 5-physician-patient relationships-effectively managing personal problems, appropriate dress and demeanor, on call availability and transfer of patient care responsibility; 6-fund of medical and rheumatological knowledge.
 
 
 6
 Id.
 
 
 7
 A second written evaluation was provided on October 16, 1985. While Dr. Tourtellotte noted some improvement in areas such as dress and peer relationships, he observed that Dr. Hankins' performance in approaching, evaluating and managing rheumatological problems remained unsatisfactory. Thus, Dr. Tourtellotte stated, Dr. Hankins was "not passing in the most significant aspect of [her] fellowship." Memorandum from Charles D. Tourtellotte, M.D. to Althea Hankins, M.D. (October 15, 1985), reprinted in Appendix at 76a-77a.
 
 
 8
 Upon receipt of this memorandum, Dr. Hankins left the hospital, leaving her patients unattended. See Letter from Charles D. Tourtellotte, M.D. to Althea Hankins, M.D. (October 18, 1985), reprinted in Appendix at 78a.[2] In response to her abandonment of these patients, Dr. Hankins was suspended from the Rheumatology Fellowship Program pending further review and investigation. Id.
 
 
 9
 On February 26, 1986, Dr. Hankins filed a complaint and motion for preliminary relief in the United States District Court for the Eastern District of Pennsylvania. She asserted that she was dismissed from the fellowship because of her race and gender, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., and 42 U.S.C. Sec. 1981.[3] Further, she contended that her fellowship was terminated without due process.
 
 
 10
 After holding hearings over several days, the district court denied appellant's motion for preliminary injunctive relief. Hankins v. Temple University, No. 86-1148 (E.D.Pa. June 30, 1986), reprinted in Appendix at 38. The district court observed that "it appeared that the dismissal of plaintiff from the program at Temple hospital was not related to plaintiff's race or sex, but rather was based upon plaintiff's inability to carry out her duties assigned and expected of her in a professional manner." Id., mem. op. at 2.
 
 
 11
 On October 15, 1986, defendants moved for summary judgment. On March 31, 1987, the district court granted the defendants' motion.
 
 II.
 
 12
 In reviewing the district court's grant of defendants' motion for summary judgment, our review is plenary, Pollock v. American Telephone & Telegraph Long Lines, 794 F.2d 860, 864 (3d Cir.1986), and we must apply the same test the district court should have utilized initially. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.1987).
 
 
 13
 Summary judgment may be entered if "the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Equimark Comm. Finance Co. v. C.I.T. Financial Serv. Corp., 812 F.2d 141, 144 (3d Cir.1987). If evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson, 106 S.Ct. at 2511; Equimark, 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 III.
 A.
 
 14
 In a discrimination case, our task is to determine whether, upon viewing all of the facts and reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff. See Pollock v. American Telephone & Telegraph Long Lines, 794 F.2d at 864; EEOC v. Hall's Motor Transit Co., 789 F.2d 1011, 1015 (3d Cir.1986). Because of the difficulty in acquiring direct evidence of employer motivation in most cases, the Supreme Court has articulated a three-step method of proof to be employed in employment discrimination cases. Dillon v. Coles, 746 F.2d 998, 1003 (3d Cir.1984). First announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), this three-prong method relies on presumptions and shifting burdens of production to establish an employer's intent to discriminate. Dillon v. Coles, 746 F.2d at 1003.
 
 
 15
 Plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination, Burdine, 450 U.S. at 252, 101 S.Ct. at 1093, whereby she must show that she was terminated from a position for which she was qualified while others not in the protected class were treated more favorably. See Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 179 (3d Cir.1985), cert. denied, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986); Duffy v. Wheeling Pittsburgh Steel Corp., 738 F.2d 1393, 1395 (3d Cir.), cert. denied, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). Once plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to dispel this presumption of discrimination, and articulate "some legitimate, nondiscriminatory reason for the employee's rejection." Burdine, 450 U.S. at 253, 101 S.Ct. at 1093. By satisfying this burden, the presumption created by plaintiff's prima facie showing drops from the case. Id. at 254-55, 101 S.Ct. at 1094. The ultimate burden of persuasion, which always rests with the plaintiff, may then be satisfied by proving, by a preponderance of the evidence, that the alleged reasons proffered by the defendant are pretextual, and that the defendant intentionally discriminated against the plaintiff. Burdine, 450 U.S. at 256, 101 S.Ct. at 1095; Molthan v. Temple University, 778 F.2d 955, 961 (3d Cir.1985).
 
 
 16
 The defendants in order to prevail in their motion for summary judgment, must show that the plaintiff will be unable to introduce either direct evidence of a purpose to discriminate, or indirect evidence of that purpose by showing that the proffered reason is subject to factual dispute. See Chipollini v. Spencer Gifts, Inc., 814 F.2d at 899. See also Molthan v. Temple University, 778 F.2d at 962 (where record shows no more than a denial of promotion as a result of a dispute over qualifications, evidence is insufficient as a matter of law to warrant any inference of discriminatory motive; judgment for defendant is proper).
 
 B.
 1.
 
 17
 The University has supported its motion for summary judgment with depositions and letters indicating that Dr. Hankins was terminated from the fellowship program for cause, and not as a result of race or gender discrimination. Several of the appellant's immediate supervisors, for instance, testified as to the reasons for Dr. Hankins' discharge. Dr. Tourtellotte stated that the appellant was deficient in medical and rheumatological knowledge and in clinical and diagnostic skills, that the hospital had received a "distressing" number of complaints from patients regarding the appellant's care, that the appellant was excessively absent, reluctant to accept constructive criticism, and had endangered the lives of several patients as a consequence of misdiagnosis and ill advised therapy. See Deposition of Charles D. Tourtellotte, M.D. at 56, 64, 65, 83, 92-93 (April 2, 1986), reprinted in Appendix at 354a, 367a, 368a, 387a, 396a-97a. Dr. Steven Berney, an Associate Professor of Medicine at Temple University, voiced similar concerns with Dr. Hankins' fund of medical knowledge and development as a fellow. See Deposition of Steven N. Berney, M.D. at 10-17, 30-31 (April 2, 1986), reprinted in Appendix at 409-16, 429-30. Similarly, Dr. Conaway testified as to Dr. Hankins' deficiencies as a fellow, and added that she had become volatile, and at times abandoned her patients. See Deposition of Douglas C. Conaway, M.D. at 16 (April 25, 1986), reprinted in Appendix at 459a. The faculty's concerns with Dr. Hankins' performance were memorialized as early as May 10, 1985, see Memorandum from Charles D. Tourtellotte, M.D. to Althea Hankins, M.D. (May 10, 1985), reprinted in Appendix at 476a, and reaffirmed in a second evaluation written in October 1985. See Memorandum from Charles D. Tourtellotte, M.D. to Althea Hankins, M.D. (October 16, 1985), reprinted in Appendix at 76a. Upon receipt of this second evaluation, Dr. Hankins left the hospital, abandoning her patients.[4] Dr. Hankins' departure resulted in her suspension from the Rheumatology Fellowship.
 
 
 18
 In sum, the University's proffered evidence in support of its motion for summary judgment demonstrates a fund of legitimate, nondiscriminatory reasons for the termination of Dr. Hankins' fellowship, clearly satisfying the second prong of Burdine. That evidence suggests the discharge of Dr. Hankins from her fellowship was the result of a series of deliberate, academic decisions by her supervisors that her performance had not met the standards set by Temple Medical School for continuation in its fellowship program.
 
 2.
 
 19
 In contrast, Dr. Hankins' proffered "evidence" of discrimination fails to raise a genuine issue of material fact as to her supervisors' motives, and is inadequate to withstand appellees' motion for summary judgment. Indeed, Dr. Hankins presents no evidence which could support a finding that the University's profferred reasons for her termination are pretextual. Rather, she appears to allege that the University engaged in a general pattern of discrimination that assumed a variety of forms. As discussed below, her contentions do not cast any doubt on the legitimacy of the University's motives in terminating her fellowship, nor suggest that, at any time, its conduct rose to the level of a violation of Title VI, Title VII or section 1981.
 
 
 20
 Dr. Hankins first contends she did not receive the salary which had been promised her, claiming that Dr. Tourtellotte, in a telephone conversation had stated that her salary would be $24,000, consisting of a $17,000 stipend and an additional $7,000 for research. She received her $17,000 stipend, but was not offered any additional research during her first year. Dr. Hankins argues that in the past, first-year white male fellows had performed drug studies. Thus, she claims, the University intentionally misled her regarding her salary, and discriminated against her on the basis of sex and race in failing to provide her with a drug study.
 
 
 21
 The record, however, is absolutely devoid of any evidence to support an allegation that Dr. Tourtellotte intentionally misinformed Dr. Hankins of her salary,[5] much less that any misrepresentation was motivated by an intent to discriminate against her on the basis of race or sex. Similarly, Dr. Hankins has profferred absolutely no evidence to support a finding that she was denied an opportunity to perform drug studies on account of her gender or race.[6]
 
 
 22
 Dr. Hankins also claims that the University discriminated against her in its allocation of vacation time. She contends that the University forced her to use vacation time to perform school work, and to take vacation time on holidays, while it permitted Dr. Conaway, a white male, to take free vacation time and to vacation when he wished. Dr. Hankins failed to produce evidence, however, establishing that Dr. Conaway, a second-year fellow, and she, a first-year fellow, were similarly situated. Moreover, as the district court noted, it was established at the preliminary injunction hearing that Dr. Conaway had less vacation time than appellant had during the first year of his fellowship, and that Dr. Hankins had more vacation time than any first-year fellow had ever had. Hankins v. Temple University, No. 86-1148, mem. op. at 4 (E.D.Pa. March 30, 1987). Dr. Hankins' allegation of disparate treatment concerning vacation time would not support a finding that the University violated Title VI, Title VII or section 1981.
 
 
 23
 Dr. Hankins further contends that while male first-year fellows had been assigned inpatient care nine months out of the year, female first-year fellows were scheduled for approximately twelve months of the year. As support, Dr. Hankins submitted copies of the Rheumatology Department assignment schedules for the past six years. These schedules, however, do not indicate which fellows are male and which are female; nor do they indicate whether the fellows are in their first or second year. More importantly, Dr. Hankins has not provided any indication whether these fellows had similar clinical training, or were, in any way, similarly situated regarding clinical needs. Indeed, Dr. Tourtellotte testified in deposition that the reason Dr. Hankins was put on service for twelve months was that the faculty had determined that such a schedule was "the best for us to evolve her skills to a level that we thought was appropriate and put us in a better position to evaluate her.... [W]e all felt in the case of Dr. Hankins, her basic clinical skills were in need of attention." Deposition of Charles D. Tourtellotte, M.D. at 38 (April 2, 1986), reprinted in Appendix at 341a. Dr. Hankins has presented absolutely no evidence to support a finding that these stated reasons are pretextual, or that the schedules were devised in a manner to intentionally discriminate against women. Thus her allegation of gender based discrimination in scheduling does not amount to a violation of Title VI, Title VII or section 1981.
 
 
 24
 Dr. Hankins further argues that she was discriminated against on the basis of sex and race when she was not invited to present an abstract before the faculty and student body at the Temple University Research Forum in June, 1985. Dr. Tourtellotte testified in deposition that the decision whether to invite a fellow to present a paper is left to the discretion of the fellow's preceptor, and that, almost exclusively, only second-year fellows are invited. See Deposition of Charles D. Tourtellotte, M.D. at 45-47 (April 2, 1986), reprinted in Appendix at 348a-350a. Dr. Hankins has failed to present any evidence from which a reasonable jury could find that she was not invited to present her paper because of either her sex or race.
 
 
 25
 Indeed, Dr. Hankins has failed to present any evidence which would raise a genuine issue as to whether race or sex played a role in either her treatment at the hospital, or her termination from the fellowship. The only possible issue of fact that she has raised is whether the faculty and staff at the hospital were mistaken in their appraisal of her medical skills, and in their decision to terminate her fellowship. University faculties, however, must have the widest discretion in making judgments as to the academic performance of their students. See Board of Curators, University of Mo. v. Horowitz, 435 U.S. 78, 96 n. 6, 98 S.Ct. 948, 955 n. 6, 55 L.Ed.2d 124 (1978) (Powell, J., concurring).
 
 
 26
 This court is satisfied that, applying the standards of Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), no reasonable jury could find that Dr. Hankins was terminated from the fellowship other than as a result of academic decisions made by professors within her department over the course of several months of interaction and observation. Dr. Hankins was afforded ample opportunity to participate in discussions over her performance. Her superiors decided, however, that she did not meet the standards set by Temple Medical School for continuation in its fellowship program, after it was determined that she was deficient in clinical skills and judgment, was excessively absent and late, demonstrated reluctance to respond to constructive criticism, and, on at least one occasion, abandoned patients under her care. Dr. Hankins even acknowledged on cross-examination that, in her opinion, the "real reason" for her dismissal was that she "antagonized Dr. Conaway." Hearing on Preliminary Injunctive Relief at 6, reprinted in Appellees' brief at 6-7. Certainly, the fact that there may have existed a conflict of personalities, or a disagreement over appellant's fund of medical knowledge, does not establish discrimination. See Bellissimo v. Westinghouse Elec. Corp., 764 F.2d at 182. Indeed, for a plaintiff to succeed in carrying the burden of persuasion, " 'the evidence as a whole must show more than a denial of tenure [or promotion] in the context of disagreement about the scholarly merits of the candidate's teaching abilities or the academic needs of the department or university.' " Molthan v. Temple University, 778 F.2d 955, 962 (3d Cir.1985) (quoting Zahorik v. Cornell University, 729 F.2d 85, 94 (2d Cir.1984).
 
 IV.
 
 27
 Dr. Hankins also contends that her termination from the fellowship was accomplished in violation of due process. She argues that she was not provided with sufficient notice or hearing, and that the University failed to follow prescribed procedures in accomplishing her suspension and termination. For the reasons discussed below, we conclude that Dr. Hankins has failed to raise any genuine issues of fact from which a reasonable jury could find that the University deprived her of due process, and that summary judgment for defendants was proper.
 
 
 28
 Dr. Hankins contends that she was entitled to be terminated from her fellowship by procedures set forth in the Temple University Hospital Bylaws of the Professional Medical Staff.[7] These procedures, however, clearly would not apply to Dr. Hankins, whose association with the hospital was defined by her appointment as a student fellow, and not as a member of the professional medical staff. Indeed, Dr. Hankins' privilege to treat patients at the hospital existed solely as a result of her graduate fellowship; her salary, fringe benefits and insurance were provided exclusively through the fellowship program.
 
 
 29
 Dr. Hankins also contends that, if she is considered a student, she had a right to be dismissed pursuant to the Temple University School of Medicine Grading and Promotional Policies. Any failure by the University to follow procedures discussed in these policies, appellant argues, amounts to a violation of her due process rights.
 
 
 30
 The Supreme Court had occasion to discuss the due process rights of students in state operated universities[8] in Board of Curators of the University of Mo. v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), and Regents of the University of Michigan v. Ewing, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). In both cases, the Court noted that courts are generally ill-equipped to review subjective academic appraisals of educational institutions, and admonished courts to permit university faculties a wide range of discretion in making judgments as to the academic performance of students. In Horowitz, for instance, the Court wrote that "the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." 435 U.S. at 90, 98 S.Ct. at 955. The Horowitz court held, therefore, that when a university decides to dismiss a student, due process does not require a formal hearing; rather, all that is required is an "informal-give-and-take" between the student and the administrative body. Id.
 
 
 31
 Similarly, in Ewing, the Court observed that when judges are asked to review a genuinely academic decision:
 
 
 32
 ... they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.
 
 
 33
 474 U.S. at 225, 106 S.Ct. at 513.
 
 
 34
 In Mauriello v. University of Med. & Dentistry of N.J., 781 F.2d 46, 49 (3d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 80, 93 L.Ed.2d 35 (1986), this court addressed issues similar to those presented in the instant appeal. A student, dismissed from a university's Ph.D. program, contended that her due process rights had been violated. Upon review of the record, this court was satisfied that the district court had erred in refusing to award the defendant a directed verdict. Noting that a student bears a heavy burden in persuading a court to set aside a faculty's judgment of academic performance, 781 F.2d at 51, we concluded that the "record left little doubt that the academic record of the plaintiff was determinative, if not the sole, reason for her dismissal." Id. We read Horowitz and Ewing as requiring only that when a student is discharged for academic reasons, an informal faculty evaluation is all that is required. Id.
 
 
 35
 Dr. Hankins contends that she was not afforded an opportunity to "plead her case" in a formal hearing, and challenge the decision to terminate her fellowship. As noted, however, she met with faculty members on numerous occasions to discuss her performance and termination. Additionally, she was provided with at least two written evaluations of her performance, both of which indicate that her deficiencies had been discussed at length in prior meetings. Moreover, Dr. Meyers held a lengthy discussion with Dr. Hankins after her initial suspension, during which she was given ample time to defend herself.
 
 
 36
 Dr. Hankins cannot deny that she was aware of the criticism of her performance as a fellow; she was on notice, no later than May 10, 1985, that her continued participation in the fellowship program was in jeopardy. We are satisfied, and Dr. Hankins has failed to demonstrate a genuine issue of fact to the contrary, that she was afforded ample opportunity to participate in discussions over her performance, and provided with sufficient notice of the faculty's concerns.
 
 
 37
 Accordingly, the order of the district court granting defendants' summary judgment motion on Dr. Hankins' discrimination claims under Title VI, Title VII and section 1981, as well as her claim for deprivation of due process, will be affirmed.
 
 
 
 *
 Hon. Barron P. McCune, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Dr. Hankins' interlocutory appeal from the denial of her motion for a preliminary injunction was rendered moot by the issuance of the district court's final order on the merits. See, e.g., American Postal Workers v. United States Postal Service, 764 F.2d 858, 860 n. 3 (D.C.Cir.1985), cert. denied, 474 U.S. 1055, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986) (district court's decision on the merits renders appeal from denial of preliminary injunction motion moot). Therefore, in affirming the grant of summary judgment, we need not address the propriety of the district court's denial of appellant's motion for preliminary injunctive relief
 
 
 [2]
 The University contends this was not the first time Dr. Hankins had abandoned patients without notice. See Deposition of Douglas C. Conaway at 16 (April 2, 1986), reprinted in Appendix at 459a
 
 
 [3]
 Dr. Hankins contends in her complaint that the appellees' alleged discrimination assumed a variety of forms: First, she states that when she began working at the Hospital in July, 1984, her instructor, Dr. Conaway, departed on a four-week vacation to Europe, forcing her to work alone during his absence. Second, she claims that she was told to move closer to the University as a result of her "occasional" tardiness. According to appellant, Dr. Conaway was also late arriving to the Hospital, but was not asked to relocate. Third, she contends that she was not given the same holidays as other Fellows in the Rheumatology section, and that she was required to schedule her vacations on Christmas holidays. Fourth, she states that the Chairman of her section required her to work during her vacation time, while Dr. Conaway's vacations were "free time" to him. Fifth, she states that she was terminated without sufficient notice. Finally, she contends that white male employees were required to work only nine months on service, while female employees were required to work twelve months on service
 
 
 [4]
 The University noted that abandoning a patient is prohibited by 49 Pa.Code Sec. 17.251(17), and is considered unprofessional and immoral conduct by the Pennsylvania State Board of Medical Education
 
 
 [5]
 Indeed, in a follow-up letter to their telephone conversation, Dr. Tourtellotte guaranteed Dr. Hankins only that the stipend for fellows was approximately $17,000. He did not suggest that Dr. Hankins would be guaranteed a drug study during her first year. Rather, he indicated that the department "may be able to supplement the basic stipend with funded studies which we may take on over and above those underway regularly." Letter from Charles D. Tourtellotte, M.D. to Althea Hankins, M.D. (May 19, 1983), reprinted in Appendix at 59a (emphasis added). There is nothing in the record, moreover, to suggest that Dr. Hankins ever indicated that Dr. Tourtellotte's memorialization of their conversations was in any way inaccurate
 
 
 [6]
 To the contrary, the record indicates that Dr. Hankins was not provided with a drug study after the faculty had determined that she was experiencing difficulty keeping up with the rudiments of her fellowship. See Deposition of Charles D. Tourtellotte at 43 (April 2, 1986), reprinted in Appendix at 346a
 
 
 [7]
 Pursuant to these regulations:
 Recommendation for censure or for suspension, reduction, or revocation shall be initiated in writing by or through the Chairperson of the Department involved and shall be referred to the Quality Assurance Committee. The Quality Assurance Committee shall make a recommendation to the Medical Staff Executive Committee. After considering the recommendation of the Quality Assurance Committee and such documentation as may be presented to it, the Medical Staff Executive Committee may suspend, reduce or revoke the staff privileges of any staff member. If the Medical Staff Executive Committee suspends, reduces or revokes the privileges of any staff member, that decision shall become effective immediately or at such other time as the Committee shall determine and the Chief Executive Office shall give notice of such action to the staff member in the manner prescribed by Article VII. If the staff member requests the right to appear before the Board of Governors, the Board shall decide whether to modify or rescind the decision of the Medical Staff Executive Committee. The Board of Governors may also, at its own instance, modify or rescind any suspension, reduction or revocation of staff privileges.
 Temple University Hospital Bylaws of the Professional Medical Staff, Article VII, section 1.
 
 
 [8]
 This court has noted that a " 'symbiotic relationship' exists between the Commonwealth of Pennsylvania on the one hand and Pitt and Temple [University] on the other. Actions taken by these two institutions are, therefore, actions taken under color of state law ..." Krynicky v. University of Pittsburgh, 742 F.2d 94, 103 (3d Cir.1984), cert. denied, 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985)