Elaine SAVKO, Plaintiff,

v.

**PORT AUTHORITY OF ALLEGHENY COUNTY, Larry Lutheran and Kathleen Radkoff, Defendants.**

Civ. A. No. 87–2390.

United States District Court,
W.D. Pennsylvania.

July 31, 1992.

Edward J. Feinstein, Berger, Kowall & Ombres, Pittsburgh, Pa., for plaintiff.

Patrick F. Kilker, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEWIS, District Judge.

After hearing evidence and argument during a non-jury trial in the above-captioned case, and after having reviewed and considered the parties' post-trial submissions, the court enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Defendant Port Authority of Allegheny County ("PAT") is a body corporate and politic organized and existing pursuant to the terms of the Second Class County Port Authority Act, 55 P.S. § 551 *et seq.* PAT provides public mass transportation in, among other places, Allegheny County, Pennsylvania.

2. Plaintiff Elaine Savko, a female, was an employee of PAT between January of 1972 and July 21, 1987.

3. Hired by PAT as a secretary, the plaintiff was promoted in 1974 to the position of personnel assistant in PAT's employment department by John Tipton, a male who was then PAT's manager of personnel services.

4. In 1978, John Tipton once again promoted plaintiff, this time to the position of employment assistant in the employment department.

5. In the positions of personnel assistant and employment assistant during the period from 1974 to 1980, plaintiff performed pre-employment screening, interviewing, test administration, and other employment-related functions.

6. In January of 1980, John Tipton promoted plaintiff to supervisor of employment in the employment department, a position compensated at the job class 10 salary rate.

7. Plaintiff's duties as supervisor of employment beginning in 1980 included screening employment applicants, interviewing, administering tests, providing orientation to new employees, supervising other employment staff and working on special projects in the employment field.

8. From 1974 through mid–1985, Savko reported to John Tipton. For the years 1980 through 1984, John Tipton evaluated Savko's performance in twelve areas. He rated Savko from commendable to superior in each area of performance for each year; he rated her highly in all areas dealing with work performance, initiative, personal habits, communications, planning, ability to interact with superiors and subordinates and in all other areas.

9. Plaintiff is distantly related to defendant Larry Lutheran, a male. During a family function held in 1978, plaintiff encouraged Lutheran to apply for a position in PAT's Management Training Program.

10. PAT's Management Training Program employed and developed middle management and staff personnel by placing baccalaureate and master-degree personnel in hourly-rated bus operator and maintenance positions for a period of six months to a year, then dispersing them to trainee positions throughout PAT's departments and finally assigning them to permanent slots. In response to plaintiff's encouragement, Lutheran, who held a bachelor's degree, applied for and was accepted into PAT's Management Training Program.

11. Following completion of the bus operator component of the Management Training Program, Lutheran was assigned in 1978 to work as a trainee in the employment department.

12. In January of 1980, Lutheran received a permanent assignment as an employment assistant in the personnel department and began reporting to plaintiff.

13. In April of 1980, Tipton promoted Lutheran to the position of assistant supervisor of employment in the employment department, where he continued to report to plaintiff.

14. As assistant supervisor of employment, Lutheran performed the same basic duties as plaintiff and assisted plaintiff in the supervision of two employees, Daryl Bigler and Kirstan Fedell.

15. Plaintiff evaluated Lutheran's job performance for the years 1980 and 1981. Plaintiff deemed Lutheran to be "promotable" and, among his other commendable attributes, determined that: he has a "professional personal appearance;" he "regularly adheres to company policy regarding working hours;" and he has an "excellent grasp of … union contract provisions which enable him to contribute a great deal to the department."

16. Sometime after 1981, plaintiff's opinion of Lutheran changed when she learned that Lutheran was having difficulty with his marriage to her blood relative and that he had become romantically involved with another PAT employee.

17. Plaintiff complained to Tipton about Lutheran getting a divorce. Tipton told her that it was Lutheran's personal business and that she must "let it go." Plaintiff responded that she could not.

18. Fearing that plaintiff's bias against Lutheran would cloud her judgment, Tipton believed it necessary to conduct the performance appraisals of Lutheran for 1982 and subsequent years.

19. In October of 1983, plaintiff and Tipton met for lunch. At that lunch, Tipton counseled plaintiff that managers and co-workers had complained to him about her inflexibility. At that same meeting, plaintiff complained that Lutheran spent too much time in Tipton's office.

20. On November 2, 1983, plaintiff delivered a follow-up memorandum to Tipton in which she referred to the complaints about her inflexibility and Lutheran's spending time in Tipton's office.[1] In her memorandum, plaintiff told Tipton that she favored "a more formal, structured management style" and Tipton had a "tendency … toward a more informal, loosely run office." According to plaintiff, this "difference in style" was the "primary conflict" she had with Tipton, and was the reason that they had come "to a crossroad in [their] working relationship." Plaintiff suggested that she maintain her duties in the "employment function" but that she be removed physically from the department and that her supervisory duties over Lutheran and Fedell be reassigned.

21. Finally, in her memorandum of November 2, 1983, plaintiff also offered an unsolicited critique of Lutheran, including "general observations" that Lutheran often returned from lunch "with strong odor of alcohol."

22. Prior to making these allegations about Lutheran's drinking to Tipton, plaintiff admittedly had never discussed any such incidents with Lutheran.

23. Plaintiff subsequently discussed her allegations of Lutheran's drinking with Ronald Willard, an individual experienced in the field of alcoholism and the coordinator of PAT's Employee Assistance Program ("EAP").

24. Ronald Willard spoke to Tipton about the possibility of Lutheran having problems associated with alcohol. Even though neither Willard nor Tipton had observed any behavior which would indicate that Lutheran had such problems, particularly in light of Lutheran's consistently perfect attendance record, Willard and Tipton agreed that they would watch him closely. Despite numerous opportunities to do so, neither ever observed any conduct on Lu-

---

1. In response to defendants' request for production of documents, plaintiff produced a copy of the November 2, 1983 memorandum, except that in the version produced plaintiff had crossed out the paragraph addressing her performance problems. Plaintiff deleted this same paragraph when she submitted the memo to the Equal Employment Opportunity Commission in support of her charge of discrimination concerning the promotion of Lutheran to manager of employee services. Thus, this court must conclude that plaintiff twice altered her November 2, 1983 memorandum in order to delete criticism of her job performance.

theran's part, including his job performance, to indicate that he had any such problems. There is no credible evidence on this record to substantiate plaintiff's attack on Lutheran.

25. On November 4, 1983, plaintiff wrote Tipton another memorandum detailing her plans for relinquishing her supervision of Lutheran and Fedell and emphasizing that her primary responsibility would continue to be in the employment process.

26. Within weeks of receiving her November 4, 1983 memorandum, Tipton complied with plaintiff's wishes and announced at a departmental staff meeting that plaintiff no longer supervised Lutheran and Fedell. They began to report to Tipton.

27. Tipton's appraisal of Lutheran's performance was higher than that of plaintiff's performance in 1983. The results of Tipton's appraisals of Lutheran's and plaintiff's performance in 1984 were similar, with both being rated "commendable." PAT did not have a formal appraisal program after 1984.

28. Prior to and during this time period, Tipton, Lutheran and other PAT employees fished together on one or two occasions, golfed together at a PAT-sponsored outing and otherwise socialized. It was not unusual for Tipton to socialize with all of his employees, male and female.

29. In 1984, Tipton was promoted from the position of manager of personnel services to director of administration, and, as a result of a departmental reorganization, Lutheran and plaintiff began reporting to Richard Ober, manager of human resources.

30. While reporting to Ober, Lutheran continued to gain experience in personnel functions other than just employment. For example, he supervised Ronald Willard in the EAP, designed and developed training programs for PAT employees and served on PAT's collective bargaining team to negotiate a new labor agreement with a union of PAT.

31. Despite Tipton's earlier advice to plaintiff that she similarly expand her professional horizons beyond the employment function, she chose not to do so. With the exception of a single business writing course, plaintiff also ignored Tipton's advice that she take college-level courses, despite the fact that PAT had a policy of paying for such continuing education.

32. Plaintiff blames Tipton for her failure to grow beyond the narrow personnel functions with which she was comfortable. For example, plaintiff testified that Tipton discussed business with Lutheran at card games that they attended with Joseph O'Hanlon, PAT's manager of employee relations, and that he withheld information from her which was necessary for her job performance. Plaintiff, however, never specified what, if any, information was withheld from her.

33. Plaintiff also claims that Tipton did not extend opportunities to her, such as working on PAT's collective bargaining negotiation team with O'Hanlon. O'Hanlon, who was called by plaintiff, testified that it was he, not Tipton, who asked Lutheran, as well as Terry Sadowsky, a female assistant supervisor of personnel administration, to join his labor negotiation team. O'Hanlon, Lutheran, Tipton, other PAT employees and persons who were not employed by PAT, did periodically play cards. Although these card games were all male, according to O'Hanlon's uncontradicted testimony, business was *never* discussed. There is simply no credible evidence that Tipton withheld information or career opportunities from plaintiff.

34. In early 1986, PAT conducted a review of all job descriptions throughout PAT to ensure that they reflected current duties. At this time, the job titles of many employees were changed as a result of the review. The title of plaintiff's position changed from supervisor of employment to employment administrator, since she had not supervised anybody since 1983. This organization-wide review of job descriptions was not related to the subsequent reorganization of the human resources department.

35. In May of 1986, the human resources department was elevated to division status at PAT, and John Tipton was

promoted to the position of director of human resources. As part of this reorganization, a new department within the division was created: the employee services department. The employee services department was to be headed by the manager of employee services, a newly-created position, and was to incorporate not only the employment function, but training and the EAP as well.

36. When creating new positions, PAT's standard procedure is for the head of the hiring division or department to complete a job analysis questionnaire and to submit it to Richard Ober or Floyd Greer. The related job description may be completed either by the head of the hiring department or by Ober or Greer. Once the questionnaire and job description are completed, either Ober or Greer review the requirements of the position as stated in the questionnaire and job description to determine a job class for the new position for compensation purposes.

37. In order to create the position of manager of employee services, Tipton completed and submitted the job analysis questionnaire to Ober's department. Tipton believed that Floyd Greer completed the related job description.

38. The job analysis questionnaire listed the qualifications required for the position as follows: a four-year degree; experience in training and written communications; educational background; and a minimum of two years of supervisory experience. The job description stated that two years of supervisory experience was necessary, as well as a two-year associate degree, an understanding of employment policies and practices, experience with employee assistance programs and a very good working knowledge of PAT's labor agreements.

39. While no study was conducted to validate the educational requirements, according to Tipton, who previously had performed all the functions for which the manager of employee services was to be responsible, the following college courses were related to satisfactory performance in that position: composition, education, communications, psychology and statistics.

Moreover, Gary Florkowski, plaintiff's statistical expert, explained that no validity study was necessary under the EEOC Uniform Guidelines on Employee Selection, as there had been no showing of any disparate impact of the educational requirements on any protected class.

40. Floyd Greer testified that normally, but not always, the questionnaire and job description are received by him before the job in question is filled with a candidate. Greer's testimony concerning the timing of this position's creation was somewhat confused and self-contradictory, but, in the end, he clearly concluded that there had been nothing out of the ordinary in how this position was created. Moreover, Greer testified that, while it was his duty as salary administrator to contest stated qualifications for positions which seemed out of line, he did not contest the required qualifications stated in the questionnaire and job description because he found them to be fair and appropriate. In fact, Greer graded the position as a job class 12 based in part upon the four-year college degree requirement, even though the job description called only for a two-year associate degree.

41. It is undisputed that the position of manager of employee services, a job class 12 position, was not posted or advertised. This conformed with PAT's policy that positions above job class 10 or positions reporting directly to a division director or positions which are filled by promotion within the same division do not have to be posted.

42. Tipton considered two candidates for the position of manager of employee services, plaintiff and Lutheran. He was familiar with the qualifications of both candidates, as he had worked with them for years, and consequently, did not interview either candidate. He also did not inform either candidate that they were under consideration, or even that the position was being created.

43. Tipton determined that plaintiff was not qualified for the manager of employee services positions because: she had neither a four-year nor two-year degree; she did not have experience with the EAP or in the training function; and she did not have

experience in the collective bargaining process.

44. While experience could substitute for the educational requirements listed for the position of manager of employee services, Tipton concluded that the plaintiff did not have experience which was tantamount to formal education in psychology, education, statistics and communications.

45. On the other hand, Tipton determined that Lutheran was qualified for the manager of employee services position and, therefore, selected him to fill the position. Tipton was aware that Lutheran held a bachelor's degree and was a product of PAT's Management Training Program, a program designed to prepare employees to assume management positions within PAT. Tipton concluded that Lutheran, through his own initiative by familiarizing himself with PAT's collective bargaining agreement and the collective bargaining process, had a knowledge of PAT's organization, as well as its needs, which extended beyond the human resources division. Lutheran also had become increasingly involved in the training function and the EAP. Finally, Tipton was aware that Lutheran was a reliable employee with a perfect attendance record and had the required supervisory experience.

46. The promotion of Lutheran to manager of employee services was made effective May 16, 1986.

47. There is no credible evidence—circumstantial or direct—that Tipton considered gender in his decision that Lutheran, not plaintiff, was qualified for and was to be promoted to the position of manager of employee services.

48. Plaintiff learned on May 12, 1986, that Lutheran was to be promoted to manager of employee services, and she initiated a charge of discrimination at that time with the Equal Employment Opportunity Commission ("EEOC"), alleging that she did not receive the promotion due to her sex. Her charge of discrimination is dated June 4, 1986.

49. On July 23, 1986, plaintiff sent a letter to Violet Markus, a representative of the EEOC who was responsible for investigating her EEOC charge over Lutheran's promotion. In her letter, plaintiff explained to Markus that "cronyism" existed between Tipton and Lutheran. Plaintiff also had stated earlier at the meeting with Tipton and Katie Johnson on May 28, 1986, that Tipton promoted Lutheran because of Tipton's "personal relationship" with Lutheran and that she would prove that Tipton exhibited "favoritism" toward Lutheran. Plaintiff and her friend, Marilyn Itzel Fontana, believed that, in order to receive preferential treatment from John Tipton, an employee had to be a member of Tipton's "clique," or in-crowd. There is some evidence of record to support this belief. Both admitted, however, that gender was not a basis for membership in Tipton's clique. In fact, the plaintiff testified that several members of the power clique were females: Kirstan Fedell, Kathleen Radkoff, Terry Sadowsky, Susan Struthers and Darleen McGill.

50. Gary Florkowski, plaintiff's statistical expert, admitted that he considered only the "general staffing" patterns of PAT and considered only the 1980 general census data for the Pittsburgh Standard Metropolitan Statistical Area ("PSMSA"). He further admitted that he did not consider the relevant labor pool, i.e., PAT's own qualified work force, when determining whether PAT's practice of promoting from within its own ranks had any adverse impact on women. Moreover, Florkowski performed no statistical analysis specifically addressing PAT's promotion practices.

51. In addition to his multiple promotions of the plaintiff, Tipton had promoted Susan Struthers and Katie Johnson, both females, to management positions in his division prior to Lutheran's promotion. On June 1, 1986, Tipton promoted defendant Kathleen A. Radkoff, who had a four-year degree in education, to the position of assistant manager of employee services.

52. After Lutheran's promotion, plaintiff approached Tipton and asked if she could be removed from Lutheran's supervision. Tipton said he would talk to Katie Johnson about her request. Johnson responded by offering the plaintiff the posi-

tion of operations procedure specialist, which would have resulted in a 5% raise in plaintiff's salary. Plaintiff rejected the position and remained under Lutheran's supervision.

53. Although they may disagree as to the cause of the problem, all of the witnesses agreed that the employee services department became an unpleasant place to work after the promotion of Lutheran because of his steadily deteriorating relationship with the plaintiff. For instance, Linda Murawski, a secretary in the employee services department, testified that there was tension between Lutheran and plaintiff, which she attributed to the conduct of both. Murawski testified that plaintiff did not like taking orders from Lutheran and that, after giving plaintiff directions, Lutheran would say, "It's great to be king." Murawski also testified that whenever plaintiff would walk up to a group of employees in the department, the group would disperse.

54. On June 5, 1986, one day after completing her EEOC charge of discrimination concerning Lutheran's promotion, plaintiff initiated an EEOC charge of alleged retaliatory harassment.

55. The court heard extensive testimony concerning a series of events beginning in May and June of 1986 (the time during which Lutheran was promoted and plaintiff filed her charges with the EEOC) and ending on July 21, 1987 (the day plaintiff was notified of her termination). According to the plaintiff, these events constitute a pattern of retaliatory harassment by Lutheran and Radkoff. According to the defendants, these same events are unmistakable evidence of the plaintiff's insubordination justifying her termination. The petty details of the childish games that were being played in PAT's employee services department will not be recounted here because they do not begin to amount to evidence proving an intent to discriminate against the plaintiff because of her gender or to retaliate against her because of her EEOC filings.

56. The last incident prior to plaintiff's termination demonstrates well the untenable state of events that had evolved between the plaintiff and her two supervisors, Lutheran and Radkoff. On July 6, 1987, plaintiff left a note in Radkoff's mail bin, which was located outside of Radkoff's office and was not visible from where Radkoff sat in her office. The note indicated that Lutheran had not contacted PAT employee Paul Gallick to direct him to attend an orientation class. Plaintiff discovered this problem no later than 8:30 a.m. the day of the class. Plaintiff's office was located at the end of a long "dead end" hallway of offices, and her office was not more than ten feet from Radkoff's office. Radkoff did not discover the note in her mail bin until approximately 10:30 a.m. Because Radkoff had been in her office all morning, she had seen plaintiff pass by her doorway several times, but plaintiff never said a word to her about the problem. Upon discovering the note, Radkoff was concerned that Gallick was not contacted that morning as soon as possible so that he could attend the orientation. While she was reviewing the note plaintiff had left her, a representative of the labor union of which Gallick was a member telephoned Radkoff inquiring why Gallick had not yet been contacted.

57. Radkoff discussed the situation with plaintiff, suggesting to her that a more effective and quicker way of communicating the problem would have been to simply talk to Radkoff about it rather than leaving a note in her mail bin. In response, plaintiff first criticized Lutheran's failure to contact Gallick as inexcusable. Radkoff told plaintiff that, in order to improve the effectiveness and reputation of the employee services department, everybody had to work together, which required effective communication, including speaking directly with each other. Radkoff then asked plaintiff if she had any suggestions how this could be achieved and whether a "middle ground" was possible. Plaintiff responded that no middle ground was possible and that she would not discuss the issue. Instead, plaintiff began to criticize Radkoff's and Lutheran's management style, emphasizing that they both were poor managers and ruined everything they touched. At

that point, Radkoff told plaintiff that such comments were bordering on insubordination, but plaintiff responded that she was free to express her opinion of their performance. Radkoff again asked plaintiff whether some middle ground was possible, explaining that direct communication among them was essential to effective communication. Plaintiff responded that she didn't want to work with Radkoff or Lutheran because she disagreed with their management philosophies. Plaintiff again criticized the management of the department and also criticized Radkoff's personal lifestyle. Plaintiff finally stated that she would never work with Radkoff because of Radkoff's lifestyle.

58. Because plaintiff had told Radkoff that she would never work with her, Radkoff felt that the time had passed for discipline, or trying to convince plaintiff to become a cooperative member of the department. Consequently, Radkoff contacted Lutheran and recommended that plaintiff be discharged.

59. While Radkoff knew that plaintiff was not happy about Lutheran's promotion, she was unaware that plaintiff had filed charges concerning the denial of promotion and retaliatory harassment with the EEOC. Radkoff was not named in either charge.

60. In view of plaintiff's insubordinate conduct, particularly her refusal to work with Radkoff, Radkoff and Lutheran decided that plaintiff's employment should be terminated and that she would be notified upon her return from vacation.

61. On July 21, 1987, Lutheran and Radkoff notified plaintiff that her employment was terminated.

62. On July 22, 1987, plaintiff filed an EEOC charge against PAT for retaliation, alleging that she was discharged for filing two prior charges of discrimination.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties herein, and has subject matter jurisdiction pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343.

2. Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), prohibits employment discrimination on the basis of sex. 42 U.S.C. § 2000e–2(a)(1).

3. Plaintiff is an employee and PAT is an employer within the meaning of Title VII. 42 U.S.C. §§ 2000e(b) and (f).

*Promotion–Disparate Treatment Theory*

4. With respect to plaintiff's claim under the disparate treatment theory of liability that she was denied promotion to the position of manager of employee services due to her sex, plaintiff has the burden of proving that defendant discriminated against her because of her sex. The burden of proof remains at all times upon the plaintiff. *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Lewis v. University of Pittsburgh,* 725 F.2d 910, 914–16 (3d Cir.1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984); *Molthan v. Temple University,* 778 F.2d 955, 961–62 (3d Cir.1985).

5. Under a disparate treatment theory, plaintiff must prove discriminatory intent. Indeed, discriminatory intent is the ultimate issue under such a theory. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Miller v. Aluminum Co. of Am.,* 679 F.Supp. 495, 503 (W.D.Pa.1988).

6. Plaintiff has presented no direct evidence of sex discrimination. Rather, plaintiff relies upon the shifting burden analysis outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That familiar analysis proceeds as follows: first, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination; second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection; and, third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but rather a pretext for discrimination.

**284**

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94.

7. At the close of plaintiff's case, the court concluded that she had successfully cleared the first hurdle of *McDonnell Douglas* by demonstrating a prima facie case of discrimination.

8. During the course of the trial, the court also found that the defendants had successfully shouldered their burden of articulating a legitimate, non-discriminatory business reason for the failure to promote plaintiff.

9. The only question remaining, then, is whether plaintiff has proved "pretext." Plaintiff's burden at the third and final stage of the *McDonnell Douglas* analysis "merges with the ultimate burden of persuading the Court that she has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Lewis,* 725 F.2d at 915. Under this burden, plaintiff must show that "but for" her sex, she would have been promoted. *Lewis,* 725 F.2d at 915–17.

■ 10. A plaintiff cannot carry her burden of proving that defendants' proffered reason is pretextual by merely showing that the defendants were mistaken in their decision. *Hankins v. Temple University,* 829 F.2d 437, 443 (3d Cir.1987). Similarly, this court is not in the business of reviewing the wisdom or reasonableness of defendants' articulated reason. *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986) ("Court does not sit as a super-personnel department that reexamines an entity's business decisions.... The question is not whether the [employer] exercised prudent business judgment."); *Tozzi v. Union Railroad Co.,* 722 F.Supp. 1236, 1241 (W.D.Pa.1989) ("... plaintiff cannot create an issue for the jury simply by challenging defendant's business judgment."). Rather, the appropriate inquiry is whether the articulated reason is a pretext for sex discrimination.

■ 11. Plaintiff failed to show that defendants' articulated reason for not pro-

moting her was a pretext for sex discrimination. There is no evidence to indicate that the stated qualifications for the position of manager of employee services were inappropriate. To the contrary, plaintiff's witness, Floyd Greer, PAT's salary administrator, testified that the qualifications as stated in the job analysis questionnaire and related job description were fair and appropriate. In addition, the evidence indicates that Lutheran was at least as qualified for the position of manager of employee services because, in addition to meeting the other requirements for the position, Lutheran had a four-year degree and experience in the training function and with the employee assistance program, which plaintiff did not. Instead, plaintiff asserts that Tipton promoted Lutheran because of their personal relationship or cronyism. Even were that the reason, such favoritism does not violate Title VII. *See, e.g., Platner v. Cash & Thomas Contractors, Inc.,* 908 F.2d 902 (11th Cir.1990); *Benzies v. Ill. Dept. of Mental Health & Developmental Disabilities,* 810 F.2d 146 (7th Cir.1987), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987); *Hill v. Bethlehem Steel Corp.,* 729 F.Supp. 1071 (E.D.Pa. 1989).

12. Plaintiff's sex was not a factor considered by John Tipton in deciding to promote Lutheran to the position of manager of employee services.

*Promotion–Disparate Impact Theory*

■ 13. In order to establish a *prima facie* case of disparate impact discrimination, a plaintiff is required to demonstrate that application of a specific identifiable employment practice or policy caused a significant disparate impact on a protected group. *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989); *Newark Branch, National Association for the Advancement of Colored People v. Town of Harrison, New Jersey,* 940 F.2d 792, 798 (3d Cir.1991).[2]

---

**2.** The Civil Rights Act of 1991, P.L. 102–166, 105 Stat. 1071, leaves unchanged the standards for a

prima facie case under both the disparate impact and disparate treatment theories of liabili-

14. "Disparate impact cases, because of their emphasis on consequences, necessarily require a focus on statistical evidence." *Newark Branch, NAACP,* 940 F.2d at 798 (*quoting Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988)); *Gilty v. Village of Oak Park,* 919 F.2d 1247, 1254 (7th Cir.1990); B. Schlei & P. Grossman, *Employment Discrimination Law* 1131 (2d. ed. 1983) ("Statistical proof is the very core of evidence in adverse impact cases because relevant assessments and comparisons must be expressed in numerical terms").

15. Therefore, the plaintiff must identify a specific employment practice that has a significantly disparate impact on employment opportunities for the protected classification in question. Civil Rights Act of 1991, P.L. 102–166, § 105(a), 105 Stat. at 1074; *Wards Cove,* 490 U.S. at 656, 109 S.Ct. at 2125 (" 'the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities' "); *Garland v. USAir, Inc.,* 767 F.Supp. 715, 726 (W.D.Pa.1991).

■ 16. As an integral part of her prima facie case, a plaintiff in a disparate impact must also establish a causal connection between the specific employment practice that she challenges and the disparate impact. Civil Rights Act of 1991, P.L. 102–166, § 105(a), 105 Stat. at 1074; *Wards Cove,* 490 U.S. at 656, 109 S.Ct. at 2124; *Ortega v. Safeway Stores,* 943 F.2d 1230, 1245–46 (10th Cir.1991); *Mallory v. Booth Refrigeration Supply Co., Inc.,* 882 F.2d 908, 912 (4th Cir.1989); *Mack v. Great Atlantic and Pacific Tea Company, Inc.,* 871 F.2d 179, 184 (1st Cir.1989).

17. Underrepresentation statistics alone cannot make out a prima facie case of disparate impact. *Wards Cove,* 490 U.S. at 656–57, 109 S.Ct. at 2124–25; *Ortega,* 943 F.2d at 1245; *Gilty,* 919 F.2d at 1254; *Mallory,* 882 F.2d at 912; *Mack,* 871 F.2d at 184; *Cox v. City of Chicago,* 868 F.2d 217, 222–23 (7th Cir.1989); *Frazier v. Consolidated Rail Corp.,* 851 F.2d 1447, 1452 (D.C.Cir.1988); *Metrocare v. Washington Metropolitan Area Transit Authority,* 679 F.2d 922, 930 (D.C.Cir.1982).

18. Similarly, a racial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions. *Wards Cove,* 490 U.S. at 653, 109 S.Ct. at 2122–23.

■ 19. Instead, a comparison between the composition of those qualified persons in the relevant labor market and that of those in the jobs at issue typically "forms the proper basis for the critical inquiry in a disparate impact case." *Newark Branch, NAACP,* 940 F.2d at 748 (*quoting Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. at 650, 109 S.Ct. at 2121).

■ 20. In promotion cases, the required comparison is between those employees actually promoted and the qualified pool of employees presumptively eligible for promotion. *Mallory,* 882 F.2d at 912; *Pouncy v. Prudential Insurance Company of America,* 668 F.2d 795, 893 (5th Cir.1982).

21. When the job in question requires managerial capability or other expertise, the comparison group must be the set of available persons with that expertise or qualification. *Hazelwood School District v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977); *Cox,* 868 F.2d at 221; *Metrocare,* 679 F.2d at 930.

22. Where a company is shown to promote from within, the relevant labor pool of qualified applicants for upper level posi-

ty. *See Id.* § 105(a), 105 Stat. at 1074; *Josey v. John R. Hollingsworth Corp.,* 1992 WL 78838, slip op. at 4 n. 3 (E.D.Pa.1992); *Cota v. Tucson Police Dept.,* 783 F.Supp. 458, 472 n. 14 (D.Ariz. 1992). Therefore, this court need not address the retroactivity of the Civil Rights Act of 1991 in order to decide the merits of this case. Be-

cause I find for the defendants today, this court's earlier opinion concerning the retroactive availability of certain types of damages in Title VII cases is also of no moment. *See Savko v. Port Authority,* 1992 WL 110466 (W.D.Pa. 1992).

tions is the group of employees in the company from which promotees will be drawn. *Shidaker v. Tisch,* 833 F.2d 627, 632 (7th Cir.1986); *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2900, 101 L.Ed.2d 933 (1988); *Paxton v. Union National Bank,* 688 F.2d 552, 564 (8th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Fisher v. Procter & Gamble Manufacturing Co.,* 613 F.2d 527, 544 (5th Cir.1980), *cert. denied,* 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981); Schlei & Grossman, at 192 (1987–89 Supp.).

23. When a plaintiff brings a disparate impact case individually rather than on behalf of a class, the plaintiff must also establish that she was a "qualified" applicant and must establish that her individual circumstances entitle her to relief. *Ortega,* 943 F.2d at 1245–46; *Gilty,* 919 F.2d at 1255; *Mack,* 871 F.2d at 184. As discussed earlier, the plaintiff has established that she was "qualified" for the job that went to Lutheran.

24. The Pittsburgh SMSA used by plaintiff's statistical expert is an improper indicator of the available labor pool of promotable employees in the present case. *Equal Employment Opportunity Commission v. Radiator Specialty Co.,* 610 F.2d 178, 186–87 (4th Cir.1979); *Equal Employment Opportunity Commission v. North Hills Passavant Hospital,* 466 F.Supp. 783, 795–96 (W.D.Pa.1979); *see also Equal Employment Opportunity Commission v. Olson's Dairy Queens, Inc.,* 57 Empl.Prac.Dec. (CCH) ¶ 41,120, at 69,988, 1991 WL 322987 (S.D.Tex.1991); Schlei & Grossman, at 1361–62 ("the objective in determining the geographic scope is to define the area from which applicants are likely to come absent discrimination").

25. Plaintiff has failed to produce any valid statistical comparison between PAT's managerial employees and qualified applicants in PAT's work force.

26. Plaintiff has failed to identify a specific employment practice of the defendant that has a significant disparate impact on employment opportunities for women.

27. Plaintiff did not produce any evidence of a causal connection between her failure to receive the promotion and the specific employment practices being challenged, namely, the failure to post positions and this link would be particularly difficult to establish in this case given that she was, in fact, considered for the position by John Tipton.

28. Thus, Plaintiff has failed to establish a *prima facie* case of disparate impact based on sex.

### Retaliation Theory

29. Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), makes it unlawful for an employer to discriminate against an employee because the employee has filed a charge of discrimination.

30. In order to establish a *prima facie* case of retaliation under Title VII, plaintiff must establish that (1) she engaged in protected activity, (2) suffered some adverse employment action, and (3) a causal connection between (1) and (2). *Miller v. Aluminum Co. of America,* 679 F.Supp. 495, 504 (W.D.Pa.), *aff'd without op.,* 856 F.2d 184 (3d Cir.1988).

31. Once a plaintiff has made out a *prima facie* case of retaliation, the employer has the burden of articulating a legitimate, non-discriminatory reason for its action. The plaintiff must then prove that the articulated reason is pretextual. *Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3d Cir.1986); *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1143 (E.D.Pa.1990).

32. The court concludes that plaintiff failed to establish a *prima facie* case of retaliation because she did not establish a causal connection between the filing of the discrimination charge and her subsequent discipline and eventual discharge from employment. Plaintiff failed to demonstrate that Radkoff was ever made aware of the fact that plaintiff had filed an EEOC charge. Radkoff was not named as respondent in any charge, and it is not disputed that Radkoff initiated the discharge of plaintiff.

33. Even if plaintiff had established a *prima facie* case of retaliation, she has

failed to prove that PAT's reasons for disciplining or discharging her were pretextual. The evidence demonstrates that plaintiff was disciplined for legitimate, non-discriminatory reasons and eventually discharged for her repeated acts of insubordination directed to Lutheran and Radkoff, particularly her statement to Radkoff that she would never work with Radkoff due to her management philosophy and her personal lifestyle. Such misconduct is not protected under Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a). *See e.g., Jackson v. St. Joseph State Hospital*, 840 F.2d 1387, 1391 (8th Cir.1988), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988); *Garvey v. Dickinson College*, 775 F.Supp. 788 (M.D.Pa.1991); *Mathews v. Capital Cities/ABC, Inc.,* 54 FEP Cases 605, 1990 WL 256304 (D.C.N.C.1990); *Floyd v. Kellogg Sales Co.,* 47 FEP Cases 1203, 1210–1211, 1987 WL 49568 (D.C.Minn.1987); and *Cyrus v. F.W. Woolworth Co.,* 677 F.Supp. 323 (E.D.Pa.1986).

34. There is no credible evidence that Radkoff and Lutheran, the managers responsible for disciplining and discharging plaintiff for insubordination, considered plaintiff's filings with the EEOC when making their decisions.

35. Judgment will be entered on all counts against plaintiff and in favor of defendants PAT, Lutheran and Radkoff.