**Garey V. ELLIS, Plaintiff,**

v.

**MOREHOUSE SCHOOL OF MEDICINE, Defendant.**

**Civil Action No. 1:93–CV–2886–FMH.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 22, 1996.

Donald W. Singleton, Dudley & Singleton, Atlanta, Georgia, for Plaintiff.

David L. Balser, Lawrence Albert Slovensky, Sheryl L. Thompson, Long, Aldridge & Norman, Atlanta, Georgia, for Defendant.

### ORDER

HULL, District Judge.

Plaintiff Garey V. Ellis ("Ellis") brings this disability discrimination claim against Defendant Morehouse School of Medicine ("Morehouse") under the Rehabilitation Act, the Americans with Disabilities Act, and Title VI of the Civil Rights Act of 1964. This matter is before the Court on Morehouse's Motion for Summary Judgment [60–1] and Ellis's Motion for Leave to File an Amended Complaint [58–1].

### I. FACTS

**A.** *Ellis's First Two Years Of Medical School*

The Morehouse School of Medicine is a private medical school located in Atlanta, Georgia. Ellis enrolled at Morehouse in the Summer of 1988. Shortly after arriving, Ellis began having difficulties with the coursework. On August 18, 1988, Morehouse gave Ellis an academic warning based upon his poor performance in the summer component of the first year curriculum.

After receiving his first academic warning, Ellis petitioned Morehouse to allow him to enter the decelerated first year medical curriculum. The decelerated first-year medical curriculum is a program which allows students to take the first year of medical school over the span of two years. In his deposition, Ellis stated that he petitioned to be placed in the decelerated program because he believed he had dyslexia. Ellis's request was initially denied and Ellis was instructed to obtain a diagnostic evaluation supporting his claim that he suffered from dyslexia.

On November 29, 1988, in connection with Ellis's request for placement in the decelerated program, Dr. Angela Franklin, a licensed clinical psychologist at Morehouse, evaluated Ellis for potential learning disabilities. Dr. Franklin issued a report of her findings which included, but were not limited to the following:

> [Ellis's] performance test scores reflect marked deficits in visual-motor coordination and visual perception of abstract stimuli (e.g. designs and symbols). His performance on other measures also reflect visual/spatial organization and difficulties as evidenced by number/letter reversals. . . .
>
> In addition, because of reading difficulties, he may need to tape lectures and/or study in a group so that he can hear the material to be learned. Investing in taped books might also be an alternative. Other strategies might be acquired if he begins working with a private tutoring agency (such as Math Set) that works directly with reading disabilities.

Franklin deposition, at 6–7 & Exh. 1.

On January 9, 1989, as a result of Dr. Franklin's report, Morehouse informed Ellis that it did not have the facilities or resources to address Ellis's deficiencies, and encouraged Ellis to seek an appropriate facility to obtain remediation of his reading and learn-

ing problems. Morehouse also informed Ellis that he would be permitted to enter the decelerated first-year medical curriculum; that he would be permitted to receive double-time to complete his examinations; and that he had been placed on academic probationary status. Ellis passed all of the courses he took during the 1988–89 academic year.

On June 13, 1989, Morehouse informed Ellis that he would be permitted to continue in the decelerated first-year curriculum; that he would remain on academic probation for the 1989–90 academic year; and that the provision made for additional time to complete examinations had expired. On September 25, 1989, Ellis wrote a letter to the Morehouse Student Academic Progress and Promotions Committee ("SAPP") requesting that he be allowed to continue to have additional time during his scheduled major course examinations. On October 3, 1989, Morehouse reinstated the "double-time privilege" to Ellis. On October 24, 1989, Dr. Franklin, also Assistant Dean for Student Affairs, sent a memorandum to all first-year course directors informing them that the SAPP committee had approved the reinstatement of the double-time privilege to Ellis and that he had been granted the option to take double the usual time on all examinations. The double-time privilege extended to Ellis by Morehouse never was revoked.

On November 14, 1989, Morehouse provided Ellis with a second academic warning based upon his performance in Gross Anatomy. On April 9, 1990, Dr. Franklin wrote Ellis a letter informing him that the SAPP Committee also was concerned about the difficulties he was having in Neurobiology.

The first two years of medical school consist of traditional classroom work in which professors lecture to students and students are evaluated by their performance on written examinations. Although it took Ellis three calendar years to complete his first two academic years, and Ellis had received two academic warnings and had been placed on academic probation, Ellis passed all of his courses during his first two years of medical school.

Additionally, Plaintiff exhibited questionable professional behavior in his first two years. On November 28, 1989, Morehouse placed Ellis on probation for deficiencies in professional behavior. In his letter to Ellis explaining Morehouse's decision, the Dean stated:

> Following our conversation of November 22, 1989, regarding the student yearbook, Dr. Angela Franklin and I have reviewed the issue. We are both very concerned with the lack of good judgment which you employed in the matter, particularly, your unauthorized use of the School's postage system. You collected official envelopes from several different departments and then placed their envelopes, containing letters requesting funds payable to you, in the institutional mail slot, in order to avoid paying postage. This behavior is not consistent with that expected of medical students.

Ellis deposition, Exh. 17.

### B. Ellis's Junior And Senior Years

Unlike the first two years, the third and fourth years of medical school consist of clinical rotations in which students are trained to evaluate, diagnose, and treat patients. Medical students spend their time in their junior and senior years "in the clinics" receiving clinical training and treating real patients.

### 1. Third–Year Medicine

Morehouse students are required to take Medicine during their third year. Dr. Myra Rose is the interim chair of the Department of Medicine for Morehouse, has been the Clerkship Director for Medicine at Morehouse since the Medicine clerkship program was started at Morehouse, and was Course Director for Ellis's third-year clerkship in Medicine. As Course Director for the third-year clerkship in Medicine, Dr. Rose had the ultimate responsibility for assigning the grade for the third-year clerkship in Medicine. Ellis complains that Dr. Rose never was informed that Ellis had a disability during his first two years of medical school and was given double-time to take written examinations. Ellis also claims that Morehouse never discussed with Dr. Rose or with Ellis the possibility that additional accommoda-

tions be made for Ellis during his third-year Medicine rotation.

In Dr. Rose's opinion, Ellis was not able to meet the requirements of Morehouse's third-year clerkship in Medicine; therefore, Plaintiff received a "D" in his third year clerkship in Medicine. In her written evaluation of Ellis's performance in the third-year clerkship in Medicine, Dr. Rose stated:

Mr. Ellis' [sic] fund of knowledge was very poor. Although eager to participate and care for patients, he demonstrated only a minimal amount of knowledge related to the patient's problems. He could identify major problems but had problems making a reasonable differential diagnosis. He understood the basic battery of initial tests and their interpretation but had difficulty proceeding further. He did not really seem to understand the components of clinical evaluation once beyond the history, physical examination, and basic problem list. History and physical examination skills were slightly below the norm for his class. He lacked an organized systematic approach to both the history and the physical examination. Oral presentations were organized but tended to be verbose. Written skills contained the basic information but lacked detailed analysis.... In the estimation of the faculty, Mr. Ellis earned a "D" for this clerkship.

Rose deposition, Exh. 4.

Ellis claims that, during his third-year Medicine clerkship, he was instructed by two attending physicians and had limited contact with Dr. Rose. Ellis's attendings were Drs. Crawford and Clayton. Ellis claims that he received a "D" in Medicine despite receiving passing scores from his attendings, and passing his national mini-board exam. In his deposition, Dr. Crawford allegedly could not explain this discrepancy, and reportedly testified that he never encountered such a situation.[1] Ellis also claims that Dr. Rose denied Ellis the reasonable accommodation of allowing Ellis additional time to take his national mini-board exam.

On June 8, 1992, Morehouse informed Ellis that he had been placed on academic proba-

tion for receiving a final grade of "D" in Medicine. A student who receives a failing grade while on academic probation is eligible for dismissal.

### 2. Fourth–Year Surgery

Fourth year students and Morehouse are required to take Surgery. In August, 1992, Dr. Linwood G. Koger, III served as the Course Director for the fourth-year Surgery course at Morehouse. Dr. Koger's responsibilities as Course Director for Surgery included supervising the clinical education of approximately six to eight Morehouse students, evaluating the performance of those students; and meeting with his colleagues in the Surgery Department to assign a final grade for each of those students.

In 1992, Ellis was a student in the fourth-year Surgery course for which Dr. Koger was the Course Director. During the four weeks in August, 1992 that Ellis was in the fourth year Surgery course, Dr. Koger had the opportunity to observe Ellis's performance. Based upon Dr. Koger's and the Surgery Department's observing Ellis's performance, Ellis received the grade of "F" in fourth-year Surgery.

Ellis complains that his attending physicians in Surgery never were informed by Morehouse that Ellis had a learning disability or that accommodations could or should be provided to him as had been done in the past. Ellis also complains that there was no discussion between Ellis, Morehouse, and Ellis's instructors regarding any possible accommodations which could be accorded Plaintiff during his fourth-year Surgery clinical.

Based on Dr. Koger's experience and judgment as a surgeon and as an Assistant Professor of Surgery, and based upon Dr. Koger's and the Morehouse Surgery Department's observation and analysis of Ellis's performance, Dr. Koger concluded:

(1) Ellis's performance in the Fourth Year Surgery course was completely unacceptable and was not consistent with a passing grade;

(2) Ellis conducted himself as if he were totally unfamiliar with a clinical clerkship;

---

1. Dr. Crawford's deposition was never filed with the Court.

(3) Ellis's lack of involvement with or understanding of his patients assumed dangerous proportions in the critical care setting;

(4) Ellis has no self-awareness of his deficiencies;

(5) Compared to his peers, Ellis was far below the level of performance expected by the Morehouse Surgery Department for a fourth-year Surgery student; and

(6) Ellis had severe performance, fund of knowledge, and attitude deficiencies and was unable to meet the essential minimum requirements of being a medical student in Morehouse's fourth-year Surgery course.

To perform the functions of a physician, an individual must be able to reach diagnostic formulations in a timely way; an individual needs to be able to integrate information from different sources; interpret what the information that he is gathering means; and compare the information that he obtains with the fund of knowledge that he possesses. One of the skills that the fourth-year Surgery course is designed to measure is the student's ability to integrate and process information promptly and accurately. In Dr. Koger's professional judgment, Ellis, in his fourth-year Surgery course, exhibited an inability to integrate and process information promptly and accurately.

In Dr. Koger's professional judgment, there is no accommodation that Morehouse can provide that would enable Ellis to perform the essential functions of a fourth-year Surgery student at Morehouse or at any accredited medical school. Of the more than 500 medical students Dr. Koger has taught and observed in his career, Ellis falls in the lowest percentile in terms of ability and performance. In Dr. Koger's professional judgment, if Ellis were permitted to continue as a Morehouse medical student, Ellis would pose a direct threat to the health and safety of patients. Finally, in Dr. Koger's professional judgment, even with supervision, if returned to the wards, Ellis would pose a significant risk of injury to patients.

## C. *The Dismissal Proceedings*

On October 1, 1992, Dr. Franklin wrote Ellis a letter informing him that because he had received an "F" in Surgery while on academic probation, he was required to appear before the SAPP Committee on Tuesday, October 20, 1992, for a dismissal hearing. On October 20, 1992, Ellis attended the dismissal hearing.

On October 26, 1992, Dr. DeWitt Alfred, Dean and Vice President for Academic Affairs, wrote Ellis a letter informing him that the Academic Policy Council, in its October 22, 1992 meeting, acting on the recommendation of the SAPP Committee, had voted to dismiss Ellis from Morehouse because of unsatisfactory academic performance.

On October 30, 1992, Dr. Mark Walker, the Chairman of Morehouse's Surgery Department at the time Ellis was a fourth-year Surgery student, sent a memo to Dr. Alfred stating that he had reviewed Ellis's performance evaluation for the general surgical and cardiovascular portions of the Surgery rotation and that the Surgery Department was formally changing Ellis's grade from "F" to "Incomplete" to afford Ellis the opportunity to repeat the fourth-year rotation. However, in a document marked Exhibit 11 to Dr. Franklin's deposition, dated November 3, 1992, and titled "Documentation of telephone conversation regarding Garey Ellis," Dr. Franklin apparently relayed to Dr. Walker that a grade change could not be accepted after a student had been officially dismissed from school. Also, the SAPP Committee does not accept grades of "Incomplete" for marginal performance. The document notes that Ellis's Surgery evaluation clearly indicated marginal performance. Additionally, Dr. Walker appeared to be concerned that Ellis did not have a right to appeal his dismissal. Dr. Walker was informed that Ellis did have a right to appeal and that the process was underway. Finally, the document stated that Dr. Walker mentioned that he and Dr. Koger disagreed on Ellis's evaluation.

On November 4, 1992, Ellis wrote a letter to Dr. Alfred officially informing Dr. Alfred that Ellis wished to exercise his right to appeal the decision to dismiss him from Morehouse. On November 12, 1992, Dr. Franklin wrote Ellis a letter acknowledging

receipt of Ellis's November 9, 1992 letter to Dr. Alfred.

In support of his appeal, Ellis wrote a letter to the Appeals Committee. Ellis wanted to Appeals Committee to recommend that he be reinstated. In the letter that Ellis addressed to the Appeals Committee, Ellis set forth several arguments why the Appeals Committee should recommend that he be reinstated as a student. In the letter addressed to the Appeals Committee, Ellis did not mention or refer to any alleged discrimination by Morehouse faculty members based on Ellis's disabilities.

On December 11, 1992, Dr. Walker sent another memo to Dr. Franklin further explaining his decision to submit a grade change in Ellis's case. In the memo, Dr. Walker explained that he was out of town and did not participate in the meeting of the curriculum Committee when Ellis's final grade was given; that after the Academic Policy Committee's vote was taken to expel Ellis, Dr. Walker reviewed the grade submitted by the Department and found no evaluation from Ellis's two-week cardiovascular rotation; and that there was a sentiment among faculty members that Ellis had been graded too harshly. Dr. Walker also stated, "It is also clear to me that we did not complete all of our documentation for his final grade of 'F.'" Franklin deposition, Exh. 10.

On January 20, 1993, Dr. Nelson McGhee, Jr., Interim President of Morehouse, wrote Ellis a letter informing Ellis that the decision to dismiss him had been upheld.

D. *Subsequent Evaluation Of Ellis*

Dr. Peter Mayfield is a licensed clinical psychologist who has been involved in the private practice of clinical psychology in Atlanta from 1962 to the present. In November, 1994, Morehouse retained Dr. Mayfield to perform a psycho-educational evaluation of Ellis to determine any learning disabilities that Ellis might have, to determine Ellis's overall ability to complete medical training successfully, and to determine if any additional accommodations might have enabled Ellis to complete his training program. Based on his observation and evaluation of Ellis, Dr. Mayfield concluded that Ellis has a full scale IQ of 78; lacks the overall cognitive ability to handle the complexities of clinical diagnosis; and, with or without accommodation, cannot perform the essential functions of a medical student. According to Dr. Mayfield:

> In conclusion, there seems little doubt but that Mr. Ellis is dyslexic even though he has learned some compensatory strategies since tested in 1988. However, dyslexia alone is not the only academic limitation present in Mr. Ellis. In my opinion, he lacks the overall cognitive ability to handle the complexities of clinical diagnosis. While he may be able to learn facts, with and without accommodations, Mr. Ellis does not have the ability to organize and integrate the myriad of clinical signs which must be taken into diagnosis. His cognitive functioning seems very inefficient in processing visually obtained information. As a medical student doing clinical work he would be required to process, often quickly, information from x-rays, monitors, and charts, in addition to the clinical symptom picture presented by the patient. In my opinion, the Morehouse School of Medicine acted correctly in dismissing Mr. Ellis from the training program—not necessarily because he had dyslexia but because of other factors having to do with cognitive ability. I can conceive of no accommodation which could have enabled Mr. Ellis to do better that [sic] which only he as a physician in training could do: independently diagnose patients in an accurate and timely manner.

Mayfield declaration, at 3.

E. *Ellis's Performance At Another Medical School After Ellis's Dismissal From Morehouse*

After Ellis was dismissed from Morehouse, he enrolled in Ross University Medical School ("Ross"), an unaccredited medical school in New York. At the time Morehouse filed this Motion for Summary Judgment, Ellis was a student in good standing at Ross. As a student at Ross, Ellis was allowed to do clinical rotations in Atlanta area hospitals with various Atlanta doctors acting as attending physicians. Ellis has completed rotations

in OB–GYN, Surgery, Cardiology, Internal Medicine, HENT, Family Practice, and Pulmonary.

### 1. *Ellis's HENT Rotation* [2]

In the Fall of 1994, Ellis contacted Dr. Herbert C. Jones for the purpose of asking Dr. Jones for the opportunity to participate in a clerkship with Dr. Jones in Dr. Jones's specialty of otolaryngology. According to Ellis, he worked under the supervision of Dr. Jones for a month. During that rotation, Ellis reportedly informed Dr. Jones that he had a disability. Upon completing that rotation, Ellis alleges that Dr. Jones wrote a letter of recommendation for Ellis which was sent to various offices and schools for Ellis's application to various residency programs.

Ellis claims that Dr. Jones has been a physician since 1961 and in private practice in Atlanta in twenty-seven years. Dr. Jones reportedly has been evaluating students for over twenty years, and has evaluated students at Morehouse for over ten years. In his letter of recommendation, Dr. Jones allegedly states that Ellis "has many positive qualities which, I am certain, will lead him to outstanding success in our profession. Specifically, he is highly intelligent, he learns rapidly, and he shows problem-solving abilities far in excess of those usually expected in a fourth-year medical student.... I therefore endorse, without reservation, his application for membership in your residency program."

### 2. *Ellis's Pulmonary Rotation* [3]

According to Ellis, around August or September, 1994, Ellis contacted Dr. Frank Cook for the purpose of inquiring whether Ellis could participate in a month-long Pulmonary rotation with Dr. Cook. Dr. Cook reportedly agreed and Ellis performed the rotation with Dr. Cook in January, 1995.

When Ellis completed the rotation, Dr. Cook evaluated Ellis's performance and returned the evaluation to Ross. When allegedly asked how Ellis compared to other Morehouse students with whom Dr. Cook had worked and evaluated, Dr. Cook allegedly responded that Ellis "seemed to be far and above many of the residents that were currently in training at Morehouse School of Medicine, and far superior, in my opinion from his work with me, than most of the students that I have worked with over the 14 years that I have been allied with the school." Dr. Cook also reportedly stated that he felt that if a student had a disability, then that student's instructors should be made aware of that disability. When allegedly asked whether he disagreed with Dr. Koger's statement that if Ellis were allowed to continue in medical school that he would ultimately fail as a physician, Dr. Cook reportedly stated that he disagreed. According to Ellis, Dr. Cook evaluated Ellis's performance in the Pulmonary rotation as excellent.

### F. *Ellis's Retaliation Claim*

Ellis also claims that Morehouse unlawfully refused to provide him with a copy of his transcript in retaliation for Ellis's filing a complaint against Morehouse with the Department of Education's Office of Civil Rights ("OCR"). On April 6, 1993, Ellis requested a copy of his transcript from Morehouse. According to Claudia Cian, Morehouse's Registrar since 1991, at this time, Morehouse had a policy of not issuing transcripts to students who were financially indebted to the school. On April 7, 1993, Morehouse informed Ellis, in writing, that it could not provide him with a copy of his transcript because he was indebted to the school.

Cian was the individual who made the decision to deny Ellis's request for a transcript based on Ellis's indebtedness to More-

---

**2.** As evidentiary support for the factual allegations contained in this section, Ellis repeatedly relies on the deposition testimony of Dr. Herbert C. Jones. However, no deposition of Dr. Herbert C. Jones has been filed with the Court and Ellis has not submitted the relevant portions on which he relies for support.

**3.** As evidentiary support for the allegations in this section, Ellis cites the deposition of Dr. Frank Cook. However, Dr. Cook's deposition was not filed with the Court and Ellis has not submitted the relevant portions upon which he relies.

house. At the time Cian decided to refrain from providing Ellis with a copy of his transcript, Cian was not aware that Ellis was intending to file a complaint with the OCR or a complaint in state or federal court.

On July 8, 1993, three months after Morehouse declined Ellis's request for a copy of his transcript, Ellis filed his OCR Complaint. On December 17, 1993, eight months after Morehouse declined Ellis's request for a copy of his transcript, Ellis filed his Complaint in this Court. On January 11, 1994, nine months after Morehouse declined Ellis's request for a copy of his transcript, Plaintiff filed a complaint against Morehouse in the State Court of Fulton County.

## II. *PROCEDURAL HISTORY*

On December 17, 1993, Ellis filed his Complaint in this Court, alleging that Morehouse violated his rights under the Rehabilitation Act, Title II of the Americans with Disabilities Act, and Title VI of the Civil Rights Act of 1964. On April 14, 1995, Ellis filed a Motion for Leave to File Amended Complaint. In Ellis's proposed Amended Complaint, Ellis bolsters the allegations surrounding his retaliation and Rehabilitation Act claims and drops Ellis's claim under Title II of the Americans with Disabilities Act in favor of a claim under Title III of the Americans with Disabilities Act. On April 28, 1995, Morehouse filed an Opposition to Plaintiff's Motion for Leave to File Amended Complaint, arguing that allowing Ellis to file an amended complaint at this stage in the proceedings would be unfair and prejudicial, and that the new claim Ellis seeks to add is futile. On May 24, 1995, Morehouse filed a Motion for Summary Judgment on all of Ellis's original claims.

## III. *SUMMARY JUDGMENT STANDARD*

Federal Rule of Civil Procedure 56(c) defines the standard for summary judgment as follows: courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The general rule of summary judgment in the Eleventh Circuit states that the moving party must show the court that no genuine issue of material fact should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–09 (11th Cir. 1991). Unless the movant for summary judgment meets its burden under Federal Rule of Civil Procedure 56, the obligation of the opposing party does not arise even if no opposing evidentiary material is presented by the party opposing the motion. *Clark*, 929 F.2d at 607–08.

■ While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. Tech-South, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510.

■ Where neither party can prove either the affirmative or the negative of an essential element of a claim, the movant meets its burden on summary judgment by showing that the opposing party will not be able to meet its burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In *Celotex*, the Supreme Court interpreted Federal Rule of Civil Procedure 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of its claim. Thus, the movant's burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

## IV. *ELLIS'S DISCRIMINATION CLAIMS*

### A. *Ellis's Claim Under Title II Of The Americans With Disabilities Act*

Ellis has sued Morehouse under Title II of the Americans with Disabilities Act, which provides in relevant part:

Section 202. Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity.

42 U.S.C. § 12132 (1994). Under section 201 of the ADA, "public entity" means:

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of the State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 502(8) of title 45).

42 U.S.C. § 12131 (1994).

■ Morehouse is not a "public entity," as that term is defined in Title II of the Americans with Disabilities Act. Morehouse is a private medical school. Morehouse is not a state or local government; a department, agency, special purpose district, or other instrumentality of a state or local government; the National Railroad Passenger Corporation; or a commuter authority. Because Ellis must show that Morehouse is a public entity as an essential element of his Title II claim under the Americans with Disabilities Act, and the undisputed facts show that Morehouse is not a public entity, Ellis's claim under Title II of the Americans with Disabilities Act is without merit.

Additionally, inasmuch as Ellis now attempts to file an Amended Complaint which drops Ellis's claim under Title II of the Americans with Disabilities Act in favor of a claim under Title III of the Americans with Disabilities Act, Ellis admits that his claim under Title II of the Americans with Disabilities Act is without merit. For this and the foregoing reasons, Morehouse's Motion for Summary Judgment on Ellis's claim under Title II of the Americans with Disabilities Act is **GRANTED**.

### B. *Ellis's Rehabilitation Act Claim*

Ellis also claims that Morehouse has violated his rights under section 504 of the Rehabilitation Act. Section 504 provides, in pertinent part:

No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794 (1994). Morehouse contends that Ellis's claim fails because he is not an "otherwise qualified individual with a disability." Morehouse also asserts that because Ellis is attempting to challenge an academic decision to dismiss him, the Court should give substantial deference to Morehouse in reviewing how its faculty exercised its professional judgment. The standard Morehouse would have the Court adopt instructs that when an academic decision is made to take some action against a student, the academic institution making the decision cannot be held liable for that action unless there was no rational basis for the decision or that the decision was motivated by bad faith or ill will unrelated to academic performance. *See Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) (employing substantial deference standard in case where student claimed that university violated his substantive due process rights in dismissing him); *Doe v. Washington University*, 780 F.Supp. 628, 631 (E.D.Mo.1991) (employing substantial deference standard in Rehabilitation Act case after finding that decision to dismiss student was an academic decision).

### 1. *Standards Applicable in a Rehabilitation Act Case*

■ Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994), prohibits entities receiving federal financial assistance from discrimination based upon the known

physical or mental impairments of a qualified individual with a disability. 29 U.S.C. § 794 (1994). To state a claim under the Rehabilitation Act, Ellis first must show that he is a "qualified individual with a disability" within the meaning of the Rehabilitation Act. 29 U.S.C. § 794 (1994); *Jackson v. Veterans Administration*, 22 F.3d 277, 278 (11th Cir. 1994); *Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir.1993). The Rehabilitation Act defines "qualified individual with a disability" as an individual who, with or without reasonable accommodation, can perform the essential functions or meet the essential requirements of the program in which such individual participates or in which such individual desires to participate. 29 U.S.C. § 794 (1994); 29 C.F.R. § 1630.2(m) (1993); *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1987). Thus, to be a "qualified individual with a disability," Ellis must show (1) that he has a disability, and (2) that he can meet essential requirements required to remain a student in good standing at Morehouse despite his disability, or, can meet the essential functions as a Morehouse medical student with a reasonable accommodation for his disability.

Once Ellis satisfies the requirement of being a "qualified individual with a disability," Ellis then must show that Morehouse discriminated against him because of his disability. Discrimination based on a disability may occur in numerous ways. In this case, Ellis alleges that Morehouse failed to reasonably accommodate his known disability.

### 2. *Some of Ellis's Claims are Time–Barred*

■ The Rehabilitation Act does not contain an express statute of limitations. Thus, the settled practice dictates adopting "a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985). In this case, the parties agree that Georgia's two year statute of limitations for torts applies. *See Henrickson v. Sammons*, 263 Ga. 331, 334, 434 S.E.2d 51 (1993) ("While the U.S. Supreme Court has not addressed this

issue, an overwhelming majority of federal courts have characterized 29 U.S.C. § 794 as providing a cause of action for injuries to the person and have, therefore, concluded that the state statute of limitation for personal injury actions is the most analogous to claims brought under 29 U.S.C. § 794."). Thus, since Ellis's Complaint was filed on December 17, 1993, any claims based on acts occurring prior to December 17, 1991, two years before the Complaint was filed, are time-barred.

Ellis's Complaint and responses to written discovery arguably allege that Morehouse's initial failure to grant Ellis's requests for double-time to take examinations in 1988 violated the Rehabilitation Act. The request was later granted in January, 1989, effective for the 1988–89 academic year. This double-time privilege expired in June, 1989. In September, 1989, Ellis was required to petition Morehouse to reinstate the double-time privilege. In October, 1989, the double-time privilege was reinstated. Ellis arguably contends that Morehouse's requiring him to re-petition for the double-time privilege violated the Rehabilitation Act.

Ellis's Complaint also states that he was not permitted the double-time privilege on several of his examinations. Specifically, Ellis claims he was not permitted double-time to take his examinations in Medical Biochemistry, Medical Physiology, Pathophysiology, Microbiology and Immunology, Pharmacology, Gross Anatomy, Neurobiology, Biostatistics and Epidemiology, Human Values in Medicine, Human Behavior, Community Health, Psychopathology, and Nutrition. Each of these examinations occurred prior to December 17, 1991.

Finally, Ellis complains that he was not permitted double-time to take the first part of his national mini-board examination. This examination also took place prior to December 17, 1991.

Ellis contends that these claims are not time-barred because they constitute continuing violations. However, the Court finds that each of these occurrences were discrete and that Ellis is not suffering from the effects of any of these alleged violations— especially considering the fact that Ellis

passed all of the examinations about which he complains. Accordingly, the two-year bar applies.

Because each of the above alleged violations occurred more than two years prior to the filing of Ellis's Complaint in this action, Ellis's claims based on these alleged violations are time-barred. Thus, Morehouse's Motion for Summary Judgment on these claims is **GRANTED.**

This leaves Ellis's claims based on his alleged improper grades in his third-year Medicine Course and his fourth-year Surgery course.

3. *Standard Applicable to Academic Decisions*

■ The courts have long faced questions involving disputes with academics institutions and students, prospective students, and former students. Although most of these disputes have involved constitutional questions and violations of the students' rights under the Fourteenth Amendment's Due Process or Equal Protection Clauses, courts have been recalcitrant when asked to review an academic institution's decision to dismiss one of its students for academic reasons. *See Regents of University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Williams v. Texas Tech Univ. Health Sciences Center,* 6 F.3d 290 (5th Cir.1993); *Haberle v. University of Alabama in Birmingham,* 803 F.2d 1536 (11th Cir.1986).

In *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), the United States Supreme Court created a distinction in student dismissal cases between students dismissed for disciplinary reasons and students dismissed for academic reasons. *See id.* at 86, 98 S.Ct. at 953 ("The need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct."). In holding that the procedural requirements attendant to dismissing a student for academic reasons need not be formal, the Supreme

Court opined that "this difference calls for far less stringent procedural requirements in the case of an academic dismissal." *Id.*

Seven years later, in *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the Supreme Court further clarified the distinction between academic and disciplinary dismissals, and identified the appropriate standard of review for courts to employ when reviewing academic decisions to dismiss a student. *Id.* at 225, 106 S.Ct. at 513. Powering the Supreme Court's analysis was Justice Powell's proposition in *Horowitz* that "[u]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* at 225 n. 11, 106 S.Ct. at 513 n. 11 (quoting *Horowitz,* 435 U.S. at 96 n. 6, 98 S.Ct. at 958 n. 6 (Powell, J., concurring)).

In *Ewing,* the Supreme Court concluded that courts should show great respect for the faculty's professional judgment, as follows:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Id.* at 225, 106 S.Ct. at 513; *see also Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982). In *Hankins v. Temple University,* 829 F.2d 437 (3d Cir.1987), the Third Circuit noted that by establishing a standard of review which shows substantial deference to academic decisions, the Supreme Court implicitly recognized that "courts are generally ill-equipped to review subjective academic appraisals of educational institutions." *Id.* at 444.

While both Supreme Court cases affording academic decisions substantial deference were decided in the due process context, several courts have applied the same deferential standards in favor of academic institutions in discrimination cases. *See Wynne v.*

*Tufts University School of Medicine,* 932 F.2d 19 (1st Cir.1991) (Rehabilitation Act); *Hankins v. Temple University,* 829 F.2d 437 (3d Cir.1987) (Title VII); *Doe v. New York University,* 666 F.2d 761 (2d Cir.1981) (Rehabilitation Act).

In *Doe v. New York University,* 666 F.2d 761 (2d Cir.1981), the Second Circuit evaluated the plaintiff's Rehabilitation Act claims against New York University for failing to re-admit her, and echoed the Supreme Court's language in *Horowitz* and *Ewing,* stating:

> Courts are particularly ill-equipped to evaluate academic performance.... For this reason, although the Act requires us rather than the institution to make the final determination of whether a handicapped individual is otherwise qualified, ... considerable judicial deference must be paid to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons.

*Id.* at 776 (holding that New York University was not entitled to summary judgment because the evidence showed that the University considered the plaintiff's handicap a factor in its decision not to re-admit her); *see also Doe v. Washington University,* 780 F.Supp. 628, 631 (E.D.Mo.1991) (employing substantial deference standard in Rehabilitation Act case in granting summary judgment to dental school which dis-enrolled dental student upon learning of his HIV-positive status).

Similarly, in *Hankins v. Temple University,* 829 F.2d 437 (3d Cir.1987), the Third Circuit applied the substantial deference standard in a Title VII case where a medical student challenged Temple University's appraisal of her academic performance. The Third Circuit noted that "[u]niversity faculties ... must have the widest discretion in making judgments as to the academic performance of their students." *Id.* at 443.

Finally, in *Wynne v. Tufts University School of Medicine,* 932 F.2d 19 (1st Cir. 1991), the First Circuit reasoned that "[i]n the context of an 'otherwise qualified-reasonable accommodations' inquiry under the Rehabilitation Act, the same principle of respect for academic decision making applies...." *Id.* at 25. The First Circuit continued that "a court's duty is first to find the basic facts, giving due deference to the school, and then to evaluate whether those facts add up to a professional, academic judgment that reasonable accommodation is not available." *Id.* at 27. In *Wynne,* the First Circuit reviewed the decision of whether the dismissal of a dyslexic medical student violated the Rehabilitation Act in light of the student's claim that allowing for testing in a manner other than multiple-choice exams was an accommodation that would have allowed him to remain as a medical student. *Id.* at 22. The medical school submitted an affidavit of its Dean indicating that it was the judgment of the medical educators who set the academic standards for the school that the skills required for the practice of medicine are best tested by written multiple-choice exams. *Id.* at 27.

While the First Circuit held that this affidavit alone did not constitute sufficient evidence to entitle the University to summary judgment on the Rehabilitation Act claim, Chief Judge (now Supreme Court Justice) Breyer disagreed with that conclusion. Justice Breyer concluded that the sole affidavit offered by the medical school provided a sufficient basis to find that the medical school complied with the Act. *Id.* at 30. Justice Breyer noted:

> First, Mr. Wynne's particular disability, a psychological learning disadvantage, is closely related to the kind of characteristic, namely an inability to learn to become a good doctor, to which Tufts reasonably, and lawfully, need not "accommodate." Second, the designing of tests aimed at screening out those who will not become good doctors is a quintessentially academic task, close to the heart of a professional school's basic mission. Third, the design of proper academic tests (as far as this record is concerned) is not itself a science, but, rather is a judgmental matter in respect to which teachers and doctors are far more expert than judges and juries.

> These three sets of circumstances should caution us against applying reasonable-sounding legal standards in a way that, as a practical matter, would force universities

to produce the kinds of proofs that seem to appeal especially to courts—'hard' evidence, tests of tests, statistical studies—for to do this is to take a basic educational decision away from those who may know the most about it, teachers using their own subjective judgment and experience, and to place it in the hands of those (say, lawyers) who will have to defend an academic decision in court.

*Id.* at 30–31. In comporting with Justice Breyer's admonitions, and considering the fact that Ellis is challenging Morehouse's academic decision to dismiss him, the Court reviews Morehouse's position that Ellis was not an "otherwise qualified person with a disability," to determine if Ellis presents any evidence that Morehouse's decision to dismiss him was so arbitrary or irrational as to not constitute an exercise of professional judgment.

### 4. *Ellis is not an "Otherwise Qualified Person with a Disability"*

#### a. *Ellis cannot meet the essential requirements as a Morehouse Medical Student*

■ To establish that he is an "otherwise qualified individual with a disability," Ellis first must show that he has an impairment which substantially limits a major life activity. 29 U.S.C. § 706(7)(B) (1994); 29 C.F.R. § 1630.2(m) (1993); *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 278–79, 107 S.Ct. 1123, 1126–27, 94 L.Ed.2d 307 (1987). Ellis suffers from dyslexia, and thus meets this requirement. Dyslexia substantially limits the major life activity of learning because it disturbs the ability to read. Morehouse does not challenge the facts that Ellis suffers from dyslexia or that dyslexia is a disability for purposes of the Rehabilitation Act. However, Morehouse does challenge Ellis's ability to meet the second requirement necessary to show that he is an "otherwise qualified individual with a disability"—that Ellis can perform the essential functions as a Morehouse medical student despite his disability or with a reasonable accommodation for his disability. 29 U.S.C. § 794 (1994); *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Jackson v. Veterans Administration,*

22 F.3d 277, 279 (11th Cir.), *cert. dismissed,* —— U.S. ——, 115 S.Ct. 657, 130 L.Ed.2d 560 (1994).

It is undisputed that Morehouse has a policy which places students on probation upon that student's receiving a failing grade in a required course. It also is undisputed that when a student on probation receives another failing grade, that student is subject to dismissal. Ellis received the failing grade of "D" in his required third-year Medicine clinical, at which time he was placed on probation. While on probation, Ellis received the failing grade of "F" in his fourth-year Surgery clinical. Thus, pursuant to Morehouse's academic standards, Ellis did not meet the essential requirements of a Morehouse medical student and was dismissed.

To challenge this conclusion, Ellis offers numerous theories. First, Ellis contends that he was graded improperly. Second, he argues that his third-year medicine instructors and his fourth-year Surgery instructors were not informed that Ellis had a learning disability. Third, Ellis submits that a member of Morehouse's faculty petitioned to change Ellis's fourth-year Surgery grade from "F" to "Incomplete." Fourth, Ellis asserts that his successful performance at an alternate medical school shows that he was qualified to continue in Morehouse's medical program.

#### i. *Ellis's Performance in Medicine and Surgery*

Since it is undisputed that Ellis (a) received a failing grade in Medicine; (b) was placed on probation; (c) received a failing grade in Surgery; and (d) was dismissed, Ellis's Rehabilitation Act claim boils down to Ellis's complaint that he was improperly graded in Medicine and Surgery. However, the evidence clearly shows that in the professional judgment of his professors, Ellis failed those courses because his performance was unsatisfactory.

In her deposition, Dr. Rose, Ellis's Medicine professor, testified that Ellis did not meet the essential requirements of Morehouse's third-year Medicine course. Dr. Rose testified that: (1) third-year students in the internal medicine clerkship are expected

to be able to gather information from patients, from charts, from labs, and from X-rays and be able to organize it and present it in a fashion that indicates that the student understands the patient's status; (2) at the conclusion of gathering information, the student is expected to be able to make a judgment as to what is wrong with the patient, to construct a problem list and to develop a patient treatment plan; (3) the third-year Medicine clerkship measures the ability of students to gather information accurately and to make reasonable assessments and judgments about patient care; and (4) that Ellis was unable to meet these requirements.

In her written evaluation of Ellis's performance in the third-year clerkship in Medicine, Dr. Rose stated:

> Mr. Ellis' [sic] fund of knowledge was very poor. Although eager to participate and care for patients, he demonstrated only a minimal amount of knowledge related to the patient's problems. He could identify major problems but had problems making a reasonable differential diagnosis. He understood the basic battery of initial tests and their interpretation but had difficulty proceeding further. He did not really seem to understand the components of clinical evaluation once beyond the history, physical examination, and basic problem list. History and physical examination skills were slightly below the norm for his class. He lacked an organized systematic approach to both the history and the physical examination. Oral presentations were organized but tended to be verbose. Written skills contained the basic information but lacked detailed analysis.... In the estimation of the faculty, Mr. Ellis earned a "D" for this clerkship.

Rose deposition, Exh. 4.

In support of his contention that he should not have received a failing grade in Medicine, Ellis emphasizes that two of his attending physicians, Drs. Crawford and Clayton, gave him passing scores and that he passed his mini-board exam. Dr. Crawford, whose deposition is not in evidence, allegedly testified that he does not recall any other situation where a student failed the third-year Medicine course under these circumstances.

Notwithstanding, Dr. Rose, as Course Director for the third-year Medicine course, had the ultimate responsibility for assigning grades to students in the course. In Dr. Rose's professional judgment, Ellis earned the grade of "D." The evidence Ellis presents does not weaken the force of the conclusion that Dr. Rose's decision to assign Ellis a "D" in Medicine cannot fairly to said to be so arbitrary or irrational as to not amount to an exercise of professional judgment. *See Ewing,* 474 U.S. at 227–28, 106 S.Ct. at 514–15 (reasoning that faculty's decision not to allow student to retake board examination was an exercise of the faculty's professional judgment although no student ever had been denied the opportunity to retake the examination in the past).

Likewise, in his declaration, Dr. Koger testified that in his professional judgment, Ellis did not meet the essential requirements of Morehouse's fourth-year Surgery course. Dr. Koger testified as to the following:

(1) The ability to understand patients, their diagnosis and their management is an essential part of continuing as a medical student in Morehouse's Fourth–Year Surgery course and is a minimum ability that all Fourth Year Surgery students must possess;

(2) Ellis did not demonstrate during his Fourth–Year Surgery course that he had any understanding of his patients, their diagnoses or their management;

(3) The ability to accurately follow protocols for management of a patient when they are explained to a Fourth–Year Surgery student is an essential part of continuing as a medical student in Morehouse's Fourth–Year Surgery course and is a minimum ability that all Fourth–Year Surgery students must possess;

(4) During one episode, Ellis was given a lengthy explanation of the course of action he was to take for management of one of his patients who was in the intensive care unit. However, despite the clear instruction on how he was to manage his patient, Ellis instructed an intern who was absent from the discussion to perform a contraindicated and dangerous intervention on the

patient, even though it had been reasonably stressed to Ellis that the course ultimately pursued on the patient was the one thing that should not be done under the circumstances;

(5) A lack of self-awareness in a student with significant deficiencies such as Ellis can be extremely dangerous and pose a significant threat to patients;

(6) Ellis demonstrated that he had no self-awareness of his deficiencies and efforts in explaining his deficiencies to him did not meet with an earnest or constructive attitude;

(7) One of the skills the Fourth–Year Surgery Course is designed to measure is a student's ability to integrate and to process information promptly and accurately;

(8) Ellis exhibited an inability to integrate and process information promptly and accurately during the Fourth–Year Surgery course;

(9) Ellis's performance in the Fourth–Year Surgery course was completely unacceptable and was not consistent with a passing grade;

(10) Ellis, when compared to his peers, was far below the level of performance expected by the Morehouse Surgery Department for a Fourth–Year Surgery student;

(11) Ellis had severe performance, fund of knowledge, and attitude deficiencies, and was unable to meet the essential minimum requirements for being a medical student in Morehouse's Fourth–Year Surgery Course;

(12) Ellis falls in the lowest percentile in terms of ability and performance of the more than 500 medical students Dr. Koger has taught and observed in his career. Koger declaration, at ¶¶ 25, 26, 28, 30, 31, 37, and 39. Dr. Koger's declaration clearly indicates that in Dr. Koger's professional judgment, Ellis did not meet the essential requirements of Morehouse's fourth-year Surgery course.

To avoid the inescapable result of this reality, Ellis presents evidence that Dr. Walker, the Chairman of Morehouse's Surgery Department, petitioned Morehouse to change Ellis's Surgery grade from "F" to "Incomplete." However, Morehouse's policy does not allow grade changes for students once they have officially been dismissed, as Ellis was at the time Dr. Walker petitioned for Ellis's grade change. Also, Morehouse does not allow professors to assign students grades of "Incomplete" for marginal performance. The evidence shows that Ellis's performance in the fourth-year Surgery course, at best, was marginal.

At any rate, the most Ellis's evidence shows is that Drs. Koger and Walker disagreed in their evaluations of Ellis's performance. However, Dr. Koger, as Course Director for the fourth-year Surgery course, had the ultimate responsibility for assigning Ellis a grade in his fourth-year Surgery course. In Dr. Koger's professional judgment, Ellis did not meet the essential requirements of Morehouse's fourth-year Surgery course.

ii. *Ellis's performance at Ross University Medical School*

To challenge Drs. Ross and Koger's assessment that he was not qualified to continue in Morehouse's medical program, Ellis asserts that after his dismissal from Morehouse, he enrolled in the Ross University Medical School and has performed successfully in that program. Ellis also asserts that he has participated in clinical rotations with Atlanta physicians and these physicians have been pleased with his performance. Various of these physicians allegedly have worked with Morehouse medical students, and in their opinion, Ellis's performance was on par or excelled their normal expectations of a Morehouse medical student.

As an initial matter, the Court notes that there is no evidence in the record supporting a substantial portion of Ellis's assertions. Ellis asserts that he performed a HENT rotation with Dr. Herbert C. Jones of Atlanta. At the completion of Ellis's rotation, Dr. Jones reportedly wrote a letter of recommendation on behalf of Ellis commenting that Ellis was certain to enjoy tremendous success in the medical profession. As support for these assertions, Ellis cites the deposition of Dr. Herbert C. Jones. However, no deposition of Dr. Jones has been filed with the

Court. Also, in Ellis's notice of filing of original discovery, accompanying Ellis's opposition to Morehouse's Motion for Summary Judgment, Ellis does not list Dr. Jones's deposition as being contemporaneously filed with the Court.

Similarly, Ellis asserts that he performed a Pulmonary rotation with Dr. Frank Cook of Atlanta. Dr. Cook reportedly has been practicing medicine for many years in Atlanta and has worked with numerous Morehouse medical students. At the completion of Ellis's rotation with Dr. Cook, Dr. Cook reportedly stated that Ellis's performance was far above most of the medical students Morehouse, at that time, was training and was near the top of all of the students with which Dr. Cook had worked in his career. Again, Ellis submits no evidentiary support for these assertions. As evidentiary support, Ellis cites the deposition of Dr. Frank Cook. However, no deposition of Dr. Cook has been filed with the Court.

Assuming *arguendo* Ellis did have evidentiary support for the assertions regarding Drs. Jones and Cook, such does not change the fact that Drs. Rose and Koger, in their professional judgment, determined that Ellis did not meet the essential requirements as a Morehouse medical student. Drs. Rose and Koger are on the faculty of the Morehouse School of Medicine, while Drs. Jones and Cook are not. Ultimately, it is the members of the faculty of Morehouse who must determine who meets the essential requirements as a Morehouse medical student. Any evidence of Ellis's performance at another medical school—especially an unaccredited school, or with various Atlanta physicians, is irrelevant.

Even if the recommendations of Drs. Jones and Cook were relevant to the question of whether Ellis was capable to meet the essential requirements of a Morehouse medical student, the most their recommendations create is a disagreement among these physicians about Ellis's capabilities insofar as the practice of medicine is concerned. Drs. Jones and Cook's recommendations are insufficient to create a jury issue under the Rehabilitation Act whether Drs. Rose and Koger's determinations regarding Ellis's performance were so arbitrary or irrational as to not constitute exercises in professional judgment. This is especially true in light of Dr. Mayfield's evaluation, discussed below.

### iii. *Dr. Mayfield's subsequent evaluation of Ellis*

Supporting Drs. Rose and Koger's determination that Ellis was not qualified to continue in Morehouse's medical program is the evaluation of Ellis by Dr. Peter N. Mayfield, a clinical psychologist retained by Morehouse for purposes of this action. Dr. Mayfield's evaluation of Ellis demonstrates that Ellis cannot meet the essential requirements of Morehouse's medical program. In his declaration, Dr. Mayfield testifies as follows:

(1) Ellis lacks the overall cognitive ability to handle the complexities of clinical diagnosis;

(2) Ellis does not have the ability to organize and integrate the myriad of clinical signs which must be taken into account in making an accurate clinical diagnosis;

(3) Ellis's cognitive functioning is very inefficient in processing visually-obtained information; and

(4) Ellis cannot perform the essential functions of a medical student.

Mayfield declaration, at ¶¶ 31, 32, and 34.

Thus, the evidence shows that two of Ellis's Morehouse professors opine that Ellis cannot meet the essential requirements as a Morehouse medical student, and that the professors' opinions are confirmed by the independent evaluation of a clinical psychologist whose assessment of Ellis's abilities parallels the assessments of Ellis's professors. Drs. Rose and Koger testified that, in their judgment, Ellis lacked an ability (a) to understand patients; (b) to formulate diagnoses; (c) to follow protocols for patient care; and (d) to integrate and process information promptly and accurately in the unique environment of a clinical setting. Drs. Rose and Koger's judgments are entitled to substantial deference and should not be set aside absent evidence that their opinions are so irrational and arbitrary as to not constitute an exercise in professional judgment. *Ewing*, 474 U.S. at 225, 106 S.Ct. at 513. Dr. Mayfield's evaluation of Ellis demonstrates that Drs.

Rose and Koger's assessments of Ellis were not irrational or arbitrary.

b. *Morehouse did not fail to reasonably accommodate Ellis's disability*

i. *Ellis's performance difficulties were not related to his disability*

■ The evidence in the record also shows that there is no reasonable accommodation which would have enabled Ellis to meet the essential requirements as a Morehouse medical student. Morehouse accommodated Ellis's learning disability of dyslexia during Ellis's first two years in Medical school, when Ellis's disability contributed to his poor performance. However, during Ellis's third and fourth years of medical school, there was no comparable accommodation which could have been made. In fact, the evidence shows that Ellis's disability should have had no affect on his performance in his third and fourth year of medical school.

After Ellis performed poorly in his first year of medical school, he was evaluated to determine if he had any learning disability. Ellis was diagnosed with dyslexia, a disability which causes an individual to invert visual stimuli thereby causing the individual to see words in sentences and letters in words backwards. For example, "God" would appear as "doG," or "David Justice" would appear as "Justice David."

To accommodate this disability, Morehouse granted Ellis the privilege of taking double-time on all of his written examinations during his first two years. Morehouse also allowed Ellis to enroll in the decelerated first-year program, which allowed Ellis to complete his first year of medical school over two years. With these accommodations, Ellis passed all of the courses in his first two years of medical school.

However, the performance problems Ellis experienced during his third and fourth years of medical school were not related to any inability to read, spell, or write. Ellis's professors noted problems with Ellis's fund of knowledge; his inability to integrate information he received from patients with his fund of knowledge to promptly and accurately formulate diagnoses and courses of treatment; and a failure to follow established protocol. Because these specific performance problems were not related to Ellis's disability, Morehouse had no responsibility to reasonably accommodate them.

ii. *Morehouse is not required to fundamentally alter its program to accommodate Ellis*

■ To the extent that Ellis's performance problems were related to Ellis's dyslexia, or any other learning disability, Morehouse is only required to accommodate Ellis to the extent that such accommodation would not fundamentally alter the nature of its program. *Southeastern Community College v. Davis,* 442 U.S. 397, 409, 99 S.Ct. 2361, 2368–69, 60 L.Ed.2d 980 (1979). In *Davis,* the Supreme Court stated:

> Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person ... Nothing in the language of history of § 504 reflects an intention to limit the freedom of an educational institution to require reasonable physical qualifications for admission to a clinical training program.

*Id.* at 413–14, 99 S.Ct. at 2370–71. Six years later, in *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Supreme Court clarified that an institution cannot be required to make "substantial" or "fundamental" changes to its programs and that any accommodations must be reasonable.

Courts have interpreted the Supreme Court's decisions in *Davis* and *Choate* as refusing to require academic institutions fundamentally to alter the nature of their programs. In *Pottgen v. Missouri State High School Activities Ass'n,* 40 F.3d 926 (8th Cir.1994), the Eighth Circuit held that an age limitation on participation in high school athletics, which had the effect of precluding from participation students whose learning disabilities delayed their progress, was an "essential eligibility requirement" and that "waiving an essential eligibility requirement would constitute a fundamental alteration in the nature of the baseball program." *Id.* at 929. *Accord Kohl v. Woodhaven Learning*

*Center,* 865 F.2d 930, 939 (8th Cir.1989) (center for learning disabled not require to accommodate violent mentally retarded carrier of Hepatitis B, where the plaintiff could not be isolated without a fundamental alteration to the center's open structure).

Similarly, in *Breece v. Alliance Tractor-Trailer Training II, Inc.,* 824 F.Supp. 576 (E.D.Va.1993), the trial court held that an applicant to a tractor/trailer training school who suffered from a severe hearing impairment and was denied admission because of his disability was not entitled to relief pursuant to the Americans with Disabilities Act. *Id.* at 579. The court stated that because the accommodations suggested by the plaintiff, including allowing a sign language interpreter to sit with him in the truck cab, would "fundamentally alter the nature of Alliance's intensive training program," *id.,* the school could not be required to make such accommodations.

### iii. *There are no reasonable accommodations for Ellis's disability*

Morehouse dismissed Ellis because he failed his fourth-year Surgery course while on academic probation for failing his third-year Medicine course. Although Ellis alleges that Morehouse failed to reasonably accommodate him, he presents no evidence that there is any reasonable accommodation which would have allowed him to pass his third-year Medicine and fourth-year Surgery courses. Ellis asserts that Drs. Rose and Koger were not informed that Ellis had a learning disability. Notably, however, the only accommodation Ellis claims he requested during either his third or fourth year was to be allowed extra time to take is national mini-board exam in medicine. Apparently, Ellis was not harmed by this "failure to accommodate," because he passed his national mini-board. The Court underscores that Ellis does not allege and that there is no evidence that Ellis made any efforts to inform the Morehouse faculty during his third or fourth years that any learning disability contributed to the difficulties Ellis experienced in his course work.

On the other hand, Dr. Koger testifies that there are no accommodations Ellis could have received that would have allowed him to receive passing grades according to Morehouse standards without fundamentally altering the nature of Morehouse's medical school program. According to Dr. Koger:

(1) The Fourth-year Surgery class at Morehouse is designed to enable the Morehouse faculty members in the Surgery Department to make a determination as to whether fourth year students are performing at the level expected by the Morehouse Surgery Department;

(2) Any alteration or modification to Morehouse's Fourth Year Clinical Surgery Program that would change the manner in which students are evaluated could dilute the reputation and value of a Morehouse medical degree;

(3) If instructors in the Fourth Year Surgery Class were required to spend additional time giving instructions to students, or to provide students with additional time to respond to questions, or were required to allow students extra time to prepare diagnoses, such requirements would fundamentally alter the nature of the Fourth Year Surgery Course;

(4) One of the skills that the Fourth Year Surgery Course is designed to measure is a student's ability to integrate and process information promptly and accurately. To eliminate or alter this requirement from the Surgery Program would fundamentally and substantially alter the essential requirements of the Fourth Year Surgery Program;

(5) There is no accommodation that Morehouse could have provided that would enable Ellis to perform the essential functions of a Fourth Year Surgery student at Morehouse or at any accredited medical school.

Koger declaration, at ¶¶ 33, 34, 35, 36, and 38. The Court also notes that as a practicing physician, Ellis cannot expect to be given "extra" time when called upon to diagnose medical problems in emergency and other situations. Considering this, Dr. Koger's unrebutted testimony, and all the other evidence in the record, the Court finds that Ellis presents no evidence which would cre-

ate a question of fact whether Morehouse failed to reasonably accommodate Ellis.

After considering all the evidence in the record, the Court finds the Ellis presents no evidence creating a question of fact whether Ellis can meet the essential requirements as a Morehouse medical student and no evidence creating a question of fact whether there is any reasonable accommodation which would allow Ellis to meet the essential requirements as a Morehouse medical student. Thus, Ellis presents no evidence that he is an "otherwise qualified individual with a disability" for purposes of the Rehabilitation Act. Alternatively, Ellis presents no evidence that Morehouse failed to reasonably accommodate his disability. For either of these reasons, Morehouse's Motion for Summary Judgment on Ellis's claim under the Rehabilitation Act is **GRANTED.**

### C. *Ellis's Retaliation Claim*

Ellis alleges that Morehouse violated his rights under Title VI of the Civil Rights Act of 1964, as codified in 34 C.F.R. § 100.7(a), by refusing to provide him with a copy of his transcript in retaliation for his filing a complaint against Morehouse with the Department of Education's Office of Civil Rights ("OCR"). Morehouse contends that Ellis's retaliation claim fails because (1) Morehouse denied Ellis's request for a copy of his transcript three months before Ellis filed his complaint with the OCR, eight months before Plaintiff filed his Complaint with this Court, and nine months before Ellis filed an additional complaint in the State Court of Fulton County, Georgia; and (2) because Claudia Cian, Morehouse's Registrar, and the individual who made the decision to deny Ellis's request for a copy of his transcript, did not know of Ellis's intention to file a complaint with the OCR or in federal or state court. In Ellis's response to Morehouse's Motion for Summary Judgment, Ellis presents no argument supporting his retaliation claim. Although it is apparent that Ellis concedes that this claim is without merit, the Court still will rule on this portion of Morehouse's Motion for Summary Judgment since Ellis has not voluntarily dismissed the claim and has not explicitly conceded that it is without merit.

Title VI of the Civil Rights Act of 1964, as codified at 34 C.F.R. § 100.7(e) provides that intimidatory or retaliatory acts are prohibited, as follows:

*Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right of privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. The identity of complainants shall be kept confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing or judicial proceeding arising thereunder.

34 C.F.R. § 100.7(e) (1994).

■ To establish a *prima facie* case of retaliation, Ellis must show (1) that he engaged in statutorily protected activity; (2) that Morehouse took adverse action against him; and (3) that there is a causal link between the two. *Meeks v. Computer Associates Int'l,* 15 F.3d 1013, 1021 (11th Cir. 1994) (test for *prima facie* showing of retaliation under Title VII). Once Ellis establishes a *prima facie* case, Morehouse must proffer a legitimate, non-discriminatory reason for the adverse action. *Id.* If Morehouse carries its burden of production, Ellis must show that Morehouse's proffered reason is mere pretext. *Id.*

### 1. *Ellis Fails to Establish Prima Facie Showing of Retaliation*

■ The evidence clearly shows that Ellis cannot establish even a *prima facie* showing of retaliation. Ellis presents no evidence of any causal relation between Ellis's engaging in any protected activity and Morehouse's refusing to provide Ellis a copy of his transcript. First, the decision to deny Ellis's request for a copy of his transcript was made before Ellis engaged in any protected activity. Ellis's request for a copy of his transcript was denied three months before Ellis filed a complaint with the OCR, eight months before he filed his Complaint in this Court, and nine months before he filed another com-

plaint in the State Court of Fulton County, Georgia.

Second, Ellis presents no evidence that Claudia Cian, Morehouse's Registrar, and the official who made the decision to deny Ellis's request for a copy of his transcript, had any knowledge that Ellis intended to file a complaint with the OCR, or in federal or state Court. To be sure, Morehouse presents evidence affirmatively showing that Cian did not have any knowledge that Ellis intended to file a complaint with the OCR, or in federal or state court, at the time she made the decision to deny Ellis's request for a copy of his transcript.

For these reasons, the Court finds that Ellis presents no evidence of a causal connection between Ellis's engaging in any protected activity and Morehouse's decision to deny Ellis's request for a copy of his transcript. Thus, Ellis cannot establish a *prima facie* case of discrimination, and his retaliation claim fails.

### 2. *Morehouse Proffers a Legitimate Non–Discriminatory Reason*

█ Even assuming *arguendo* that Ellis could establish a *prima facie* case of retaliation, Morehouse has proffered a legitimate, non-discriminatory reason for its decision to deny Ellis's request for a copy of his transcript, thereby rebutting any inference of discrimination Ellis may raise.

On April 6, 1993, Ellis requested a copy of his transcript from Morehouse. At that time, Morehouse had an established and published policy of not releasing transcripts to any student who was financially indebted to the school. This policy was set forth in the Morehouse 1992–93 Student Handbook, of which Ellis received a copy. On April 7, 1993, Morehouse informed Ellis in writing that it could not provide him with a copy of his transcript at that time because he was indebted to the school.

The evidence in the record clearly shows that Morehouse was not retaliating against Ellis when it denied his request for a copy of his transcript, but rather was relying on a policy which applied to all of Morehouse's students (and former students). Thus More-

house satisfies its burden of coming forth with a legitimate non-discriminatory reason for its decision to deny Ellis's request for a copy of his transcript. Because Ellis presents no evidence that Morehouse's proffered reason is mere pretext, Ellis cannot survive Morehouse's Motion for Summary Judgment.

For the foregoing reasons, Morehouse's Motion for Summary Judgment on Ellis's retaliation claim under Title VI of the Civil Rights Act of 1964 is **GRANTED.**

### V. *ELLIS'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT*

On April 14, 1995, Ellis filed a Motion for Leave to File Amended Complaint. Ellis seeks to modify his original Complaint by dropping his claim under Title II of the Americans with Disabilities Act and replacing it with a claim under Title III of the Americans with Disabilities Act. Title II of the Americans with Disabilities Act does not apply to Morehouse because Title II only applies to public entities, while Morehouse is a private entity. Title III, however, does apply to Morehouse, as its ambit extends to public accommodations, which include institutions of higher learning.

█ Ellis's Motion for Leave to File Amended Complaint is **DENIED** for two reasons. The Court has discretion to grant or deny motions for leave to file amended complaints. The Eleventh Circuit has held that courts may exercise that discretion to deny said motions if the proposed amendments are futile. *Hargett v. Valley Federal Savings Bank,* 60 F.3d 754, 761 (11th Cir.1995); *Motorcity of Jacksonville, Ltd. v. Southeast Bank,* 39 F.3d 292, 297 (11th Cir.1994); *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1042 (11th Cir.1986); *Halliburton & Associates v. Henderson, Few & Co.,* 774 F.2d 441, 444 (11th Cir.1985).

█ The elements for sustaining a claim under Title III of the Americans with Disabilities are substantially similar to those required to sustain a claim under the Rehabilitation Act. The Court already has granted Morehouse's Motion for Summary Judgment on Ellis's Rehabilitation Act claim. For the reasons discussed in that portion of

the Court's Order, the Court finds that any claim Ellis may state under the Americans with Disabilities Act also would be without merit.

 Also, Ellis's Motion is untimely. Ellis did not file his Motion for Leave to File an Amended Complaint until the last day of a thrice-extended discovery period. Ellis contends that his proposed Amended Complaint advances no new theories, and is based on the same facts as the claim he seeks to drop. Ellis files this Motion because Ellis's initial counsel in this action filed a claim under the incorrect provision of the Americans with Disabilities Act. However, Ellis's new counsel was retained on November 29, 1994. Although it was clear at that time that Title II of the Americans with Disabilities Act only applied to public entities, and that Morehouse was not a public entity, Ellis's new counsel did not file this Motion until the end of the discovery period, almost six months later. For these reasons the Court finds that Ellis's Motion is untimely.

Moreover, because Ellis did not file this claim until the end of the discovery period, Morehouse did not have the opportunity to gather evidence in defense of Ellis's proposed claim during discovery. Considering this, along with the fact that Ellis's Motion was filed at a time when Morehouse already had begun preparing its Motion for Summary Judgment on all of Ellis's claims, the Court finds that allowing Ellis's Amended Complaint to be filed would prejudice Morehouse in this action.

Therefore, Ellis's Motion for Leave to File Amended Complaint is **DENIED.** Also, Ellis filed a Second Supplemental Responses to the Court's Mandatory Interrogatories, apparently to give support to his proposed claim. The Court orders these Supplemental Responses stricken from the record.

## VI. CONCLUSION

Ellis's Motion for Leave to File Amended Complaint [58–1] is **DENIED.** Morehouse's Motion for Summary Judgment [60–1] on all of Ellis's claims is **GRANTED.**

The Clerk is directed to enter final judgment in favor of Morehouse on all of Ellis's claims.

It is **SO ORDERED.**